**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X

ASHU SHUKLA,

                Plaintiff,

                   -against-

APPLE INC.,
DELOITTE CONSULTING LLP

                Defendant.
-----------------------------------------------------------------------X

**Index No.:**

**VERIFIED**
**COMPLAINT**

Plaintiff, ASHU SHUKLA (hereinafter "Plaintiff"), as and for his Complaint against defendant APPLE Inc. ("Apple"), DELOITTE CONSULTING LLP ("Defendant"), alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction of the claims that arise under US Federal laws and New York laws.

2. Venue is proper because at least one of the parties resides in New York County.

3. Plaintiff ASHU SHUKLA is a resident of New Jersey and a former employee of the Deloitte Consulting LLP.

4. Plaintiff ASHU SHUKLA applied for multiple fulltime position at Apple. Apple selected plaintiff's profile, however, refused to hire the plaintiff.

5. Upon information and belief, Defendant DELOITTE CONSULTING LLP ("Deloitte"), is a foreign corporation with its principal place of business located 30 Rockefeller Plaza, New York, NY 10112.

6. Upon information and belief, Defendant Apple Inc ("Apple"), is a foreign corporation with its principal place of business located One Apple Parkway, Cupertino, CA 95014.

7. This is a civil action seeking monetary relief, compensatory damages, disbursements, costs and fees for violations of Plaintiff's rights resulting from Apple Inc.'s failure to hire the plaintiff in violation of U.S. Federal laws, New York State employment laws, and retaliation.

8. Specifically, Plaintiff alleges that Defendants Apple negligently, intentionally, and knowingly sought and did wrongfully deprive him of his employment, position, title, and pay through discrimination and retaliation and by failing to hire him.

9. Plaintiff also alleges that Defendant intentionally, recklessly, and knowingly sought to maintain an illegal control of his federal and state civil and constitution rights, his personal liberty, his life, health, personal wellbeing, employment opportunities and willfully discriminated against him. Plaintiff alleges that Defendant purposefully and intentionally, violated plaintiff's civil and constitutional rights and committed other wrongful acts after his termination of employment.

10. The alleged acts against Plaintiff were done knowingly, purposely, and with all intentions of depriving him of his right to be free of discrimination and retaliation for purposes of employment with the defendant Apple Inc.

11. The Federal Court of New York, New York has subject matter jurisdiction, supplemental jurisdiction as well as remedial authority over this case pursuant to the various federal civil right laws, federal statutes, state law violations and common law torts.

12. This is a civil action seeking monetary relief, compensatory damages, injunctive relief, disbursements, costs and fees for violations of Plaintiff's rights resulting from plaintiff not being hired for a fulltime job opportunity by defendant, Apple Inc., in violation of U.S. Federal laws, New York State employment laws, and retaliation.

13. The Federal and State Court of New York, New York have jurisdiction over this matter since (a) the Defendants Deloitte and Apple maintain a place of business New York County where the Plaintiff was employed, (b) Plaintiff received a notice of right to sue defendant Apple from Equal Employment Opportunity Commission (EEOC) on January 12th 2021, and (c) plaintiff's claims are valid in both Federal and State courts.

## PARTIES AND RELEVANT INDIVIDUALS

14. Plaintiff, ASHU SHUKLA, is a former employee of Defendant DELOITTE CONSULTING, LLP, ("Defendant Deloitte" or "Deloitte").

15. Plaintiff, ASHU SHUKLA, applied to various employment opportunities at Defendant APPLE INC., ("Defendant Apple" or "Apple")

16. Defendant, DELOITTE CONSULTING LLP, is a professional services firm that provides consulting services to a wide range of clients. The parent company of Deloitte Consulting LLP is Deloitte LLP. Deloitte LLP employs over 287,000 employees globally. Upon information & belief, in 2019, Deloitte LLP had total revenues of over $43,000,000,000 (Forty-three Billion USD)

17. Defendant, APPLE INC. ("Apple"), is a multinational technology company headquartered in Cupertino, California, that designs, develops and sells consumer electronics, computer software and online services. Apple employs over 140,000 employees globally. Upon information & belief, in 2020, Apple had total revenues of over $274,000,000,000 (Two-Seventy-Four Billion USD)

18. On January 7th 2021, the Equal Employment Opportunity Commission (EEOC) mailed the Notice of Right to Sue to the Plaintiff. The notice of right to sue was mailed from San Jose, CA to the

plaintiff in Princeton, NJ on the January 7th 2021, and the plaintiff received the mail on January 12th 2021. The plaintiff has filed this lawsuit within 90-days of the date of receipt of the Notice of Right to sue from EEOC.

19. Defendants are subject to Federal laws and State laws of the State of New York.

## FACTS

20. Plaintiff ASHU SHUKLA is a 36 -year old male of Indian national heritage who suffers from serious allergies which cause anaphylactic reactions and disability when triggered.

21. Plaintiff was awarded a Bachelor's degree in Electronics and Telecommunication Engineering in 2006 from India, and a Master's degree in Information Systems in 2010 from New York University – Courant School of Mathematics and Stern School of Business. Using this education, Plaintiff has amassed over 10 years of experience in the Technology Consulting Industry.

22. Approximately 9 years into his consulting career, in October, 2016, Plaintiff was offered a position as Senior Consultant in the Defendant's New York office. After accepting the offer and clearing various background checks, the Plaintiff commenced working in December, 2016.

23. As employee for Deloitte Consulting LLP, Plaintiff enjoyed success in managing and delivering several projects where he helped the Deloitte and its clients develop and implement solutions and improvements to their businesses. He was praised for his work both by Defendant's leadership and by Defendant's clients. In 2017, the Plaintiff was also honored with the Deloitte US Consulting Business Solution Award after winning a cross Deloitte Consumer & Industrial Products (C&IP) practice solution competition Honors award on Consumer Product ideation challenge.

24. Before the plaintiff was diagnosed of his medical condition / disability in April 2017, Plaintiff got good performance reviews, and was liked by defendant Deloitte leaders and clients. In April 2017, plaintiff received good performance review for his client work at Citibank, and was appreciated by both Deloitte Leader, Sr. Manager Jintae Lee, and Citibank Leader Sr. Director Thomas Reynolds.

25. Similarly, Plaintiff's performance was liked by Deloitte leaders, clients and colleagues. (a) In June - July 2017, plaintiff was appreciated for his client work at Pfizer by both Deloitte leader, Aditya Kudumala, Partner Deloitte Consulting LLP and Patrick McBrearty, Sr. Manager Deloitte Consulting LLP, and Pfizer leader Sr. Director Jerry Whaley. (b) As a matter of fact, plaintiff used his Pfizer project experience to create several firm eminence materials, and got a good performance review for all those firm eminence materials by Deloitte Leader Sr. Manager Sriram Ramamurthy. (c) In addition, in Aug – Sept. 2017, plaintiff was appreciated and recommended by his Deloitte Leader, Ryan Hoffmeister, Director Deloitte Consulting LLP, based on plaintiff's knowledge in the field and his work at client Celgene. (d) Plaintiff's good performance was also verified by Deloitte Leader, Robert Kennedy, Sr. Manager Deloitte Consulting LLP.

26. On February 23rd 2018, the above project performances and referrals were also verified by two Deloitte female managers, Aditi Shankar and Rushika Patel, both Managers, Deloitte Consulting LLP, who confirmed plaintiff for another project at Citibank, and who at the time, were not negatively influenced by Deloitte Human Resource professionals. However, plaintiff was given a poor performance rating for the 2017-18 performance cycle in spite of his good performance.

27. In addition, Plaintiff was liked and appreciated by his male colleagues. For performance year 2017-18, plaintiff got great appreciation on his internal firm contribution projects. (a) Shynish Maru, Manager, said "*plaintiff contributed significantly on the client RFP*" (b) Wout Vandegaer, Sr. Manager, said *plaintiff was a driver and contributor* (c) Jamil Siddiqui, Specialist Leader, said "*plaintiff worked well, collaborated with team effectively*" and "*helped create critical time sensitive RFP response*" (d) Kartik Nagaraja, Sr. Manager, in Feb. 2018 said "*plaintiff had made significant impact on couple of client proposal responses they had been working on*", "*Kartik is actively trying to staff the plaintiff on a project*" and "*Plaintiff was a great add to the team, he was able to single handedly manage RFP drafts, own his pieces and deliver upon them*" (e) Kathick Kannan, Specialist Master, said plaintiff was "*very quick in understanding the needs, even though the proposal that we were working is not his expertise*" (f) Sriram Ramamuthy said plaintiff had "*Good understanding of subject matter and ability to follow-through*", and *plaintiff* "*did a good job of collating use cases and quals from various clients for analytics and cognitive workshops at multiple LS clients*".

28. However, plaintiff was given a poor performance rating for the 2017-18 performance cycle by female members of defendant human resource department, Joanna Rohde and Brenda Arenda, in spite of his good performance. Defendant Deloitte knowingly and wantonly issued the plaintiff a false negative performance rating, a false non-discriminatory reason for adverse action, <u>after</u> the plaintiff was diagnosed of his medical condition / disability in April 2017. Plaintiff was treated differently than similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, who were not discriminated based on their medical condition / disability and were given a good performance rating for their work.

29. Plaintiff was also liked and appreciated by his Junior and Senior female colleagues (a) Danica Devito, Campus Placement Officer, *invited the plaintiff to present an information session* on Deloitte's behalf at *Duke University Management school*, (b) Morgan Carlon, Manager, and Megan Gorges, Business Analyst, *praised plaintiff's work ethics*, (c) Lydia Schffield, Business Analyst, said *"she really enjoyed working with the plaintiff"*, (d) Shelly Rescober, Sr. Manager, said *"it was nice working with the plaintiff"*, (e) Aditi Shankar and Rushika Patel, Managers, who thoroughly *checked all of plaintiff past project performances and references* on February 23rd 2018 said '*it was great to have the plaintiff onboard and they look forward to working with plaintiff*', (f) Karma Porter, Fanzi Mao Pitzer, Tanya Srivastava said *they really liked working with the plaintiff*, (g) plaintiff was appreciated by Shruti Nayyar, Manager, *for work at Client Takeda commercial data governance pursuit.* However, in Nov. 2018, plaintiff was terminated by the defendant in spite of his good recommendations and appreciations by female colleagues.

30. Similarly, after the defendant learned about plaintiff's medical condition / disability, and the malicious sexual harassment allegations against him in early 2018, Plaintiff's performance was liked by defendant leaders, clients and colleagues. (a) In July and Aug. 2018, plaintiff was praised for his work at Client Bausch Health by Deloitte Leader Peter Harbin, Director Deloitte Consulting and Anand Sairam Sr. Manager Deloitte Consulting, and client Leader Chandra Miranda, Sr. Manager Bausch Health. (b) In Aug. 2018, plaintiff was appreciated by Ball Corporation Client Leader, Kristian Guerrero, Manager. However, in Nov. 2018, plaintiff was given a bad performance rating, and terminated by the defendant for performance reasons in spite of his good recommendations and appreciations by Deloitte and Client Leadership.

31. On his employment lawsuit, the Plaintiff has alleged that his claims for retaliation, and discrimination based on his disability, gender, national origin and race are intertwined. In year 2017 of his employment with Deloitte, the Plaintiff received good performance rating until the defendant became aware of his disability / medical condition.

32. The facts stated below clearly identify facts that after learning about plaintiff's disability / medical condition in 2017, after learning about the a sexual harassment complaint by a 62-year old female employee (almost double the plaintiff's age) in early 2018, after learning about the assignment of disproportionately heavy work assignment with racial bias in early 2018, the firm Deloitte Consulting assigned the plaintiff projects that were outside of plaintiff's core industry experience and expertise, removed him from multiple projects and changed his project responsibilities that were so significant as to constitute a setback in plaintiff's career.

## I.   Discrimination based on Medical Condition / Disability

## Discrimination by Deloitte based on Plaintiff's Medical Condition / Disability

33. On December 14, 2017, Plaintiff attended a Deloitte year-end event where alcohol was served to all attendees. After drinking one-and-half of the alcoholic drinks served to him, the Plaintiff suffered a serious anaphylactic reaction, where he remembers feeling a choking sensation caused by his throat swelling shut and began to lose consciousness. The Plaintiff does not remember the events after that. That night, he vaguely remembered, two Deloitte partners had carried him to a hotel.

34. The following morning, the Plaintiff reported the events of the prior evening and his condition to one of the Deloitte Partners, Michael Fernandez, who had carried him to a hotel, by both email and phone. Michael first contacted the Plaintiff over email. In the morning, Plaintiff continued to suffer breathing difficulty, experienced itchy throat and observed rashes and hives on his body.

35. Eight months before the event, in New York, the Plaintiff was tested and diagnosed with potentially life-threatening allergies that could result in anaphylaxis, a condition for which the Plaintiff was prescribed an EpiPen. Upon information and belief, the drinks and food served and

consumed contained allergens which triggered an allergic reaction in the Plaintiff, rendering him temporarily disabled.

36. On around December 18, 2017, three days after Plaintiff's anaphylactic reaction, Plaintiff was advised that he would no longer be sent to work on the JP Morgan project in the UK. Although the Plaintiff had already purchased a plane ticket and obtained his visa to travel, the project leader told him that she was getting "pressure from above" not to put him on the project. The project leader also accused the plaintiff of buying an airplane ticket without her approval, when in-fact the air-ticket was a requirement placed by the UK consulate to obtain a visa and the same was discussed with the project leader.

37. Soon thereafter, it became apparent that the Defendant did not want to assign the Plaintiff to any projects and intentionally sent the Plaintiff to client interviews for which he was destined not to be hired due to lack of relevant experience. For instance, approximately a week after learning that he would not work on the JP Morgan project, the Plaintiff was asked to interview at a client on leading Data Governance training project for 40,000+ employees globally. Since the Plaintiff had no experience in this domain, he was not assigned to the project. Similarly, the Defendant asked the Plaintiff for project that required deep knowledge of health care industry which the Plaintiff did not have. Upon information and belief, Plaintiff was singled out due to his medical condition and treated differently from other employees in this regard. In fact, Plaintiff was treated differently than he had been treated before the Defendant became aware of his medical condition and disability. Never before had he been sent to interview for projects he was not qualified for.

38. Due to his serious allergic reaction and temporary disability caused when the allergy is triggered, Plaintiff was singled out and treated differently from similarly situated employees who did not suffer from life-threatening allergies or disabilities. Upon information and belief, similarly situated employees who did not suffer from life- threatening allergies or disabilities did receive bonuses for their work and were not harassed on an ongoing basis by their supervisors.

39. In around February, 2018, the Plaintiff took part in firm-wide ethics, integrity and compliance training. Based on the training he received, he reported an observed misbehavior from his previous project leadership to Human Resources (HR). Specifically, on his written complaint, the Plaintiff reported that, he was assigned the workload of two fulltime employees. On this particular

project, the plaintiff was threatened against raising such issues with supervisors in higher positions and learned it would 'obviously result in a bad rating', he faced unprofessional treatment by his supervisor and finally was removed from the project by his immediate supervisors.

40. When Plaintiff appeared for a meeting regarding his report to Deloitte Partner Deborshi Dutt and Brenda Arends of HR on February 16th 2018, HR showed no interest in the matter reported but instead wrongly accused the Plaintiff of being inebriated on two (2) different occasions and asked the Plaintiff to sign a Letter of Reprimand admitting he was inebriated on two (2) separate events on two (2) different dates otherwise his employment would be terminated.

41. Brenda Arends further advised that if the Plaintiff did not sign the Letter within two (2) days, his employment would be terminated. On the same phone call, the Deloitte Partner Deborshi Dutt told the Plaintiff "we are watching you" and "there will be consequences to such actions". Plaintiff did not sign the letter and, instead, produced multiple witnesses to confirm that he was sober at the other event and of his underlying medical condition.

42. During the course of next several months, various Deloitte supervisors began harassing the Plaintiff regarding his anaphylactic reaction by mocking him. For example, on August 27th 2018, on the evening of the day when Deloitte declared Bonus payouts to employees, a Deloitte Consulting Sr. Manager, Sriram Ramamurthy, called the Plaintiff, mocked him for not getting any bonus, inquired multiple times about Plaintiff's lack of bonus, and harassed the Plaintiff by suggesting that he would be released from the client project the Plaintiff had been working on. Four (4) days later the Plaintiff was, in fact, released from the project.

43. On or about August 30th, 2018, Brian Zhong, Sr. Manager, Deloitte Consulting, in spite of the Plaintiff's fantastic project work which secured great appreciation from the client, acted with hostility towards Plaintiff, falsely claiming that he observed 'gaps and empty spaces' on the Plaintiff's near perfect work and that the Plaintiff's performance deteriorated when he heard he was not getting any bonus for his last year's work. Five weeks after joining the Ball Corporation project, Brian Zhong released the Plaintiff from the project, admitting to the Plaintiff that he was getting pressure from the Partner and HR to release the Plaintiff from the project.

44. Defendant Deloitte continued to single out, discriminate against and harass the Plaintiff throughout 2018. Upon information and belief, the Defendant carried out an ongoing scheme to intimidate, harass and force the Plaintiff out of the company because Defendant knew it would be illegal to terminate the Plaintiff based upon his medical condition and temporary disability which occurred when his allergies were triggered. Upon information and belief, Defendant did not want to continue to employ Plaintiff due to his life-threatening allergies but, instead, sought to retaliate against the plaintiff for defending himself with proof of his medical condition.

45. In September and October 2018, the Plaintiff's submitted his profile for various client projects on the internal job portal, but his Resource Manager (RM) kept closing his project role submissions requests citing - *'Position Closed, Not selected'*. Upon information and belief, Plaintiff was singled out and treated differently than similarly situated employees who did not suffer from life threatening allergies. Upon information and belief, the project role submission requests submitted by other similarly situated employees who did not suffer from allergies were not immediately closed.

46. Thus, plaintiff's project opportunities were limited by the defendant, and he was pushed to choose projects that were outside of his skill-set and expertise like the Kaiser Permanente project. Plaintiff came to understand that these assignments with no formal training, and outside of expertise, were specifically meant to target the plaintiff making his assignments, ability to achieve and prove good results more difficult. Upon information and belief, similarly situated employees who did not suffer from allergies were not assigned projects for which they did not have industry experience or formal training, or were outside of their skillsets.

47. Defendant Deloitte ultimately terminated the Plaintiff's employment over email on November 5th 2018 while the Plaintiff was on a sick leave with his three-week paid time leave starting the next day.

48. After termination, Defendants continued to harass the Plaintiff by intentionally revoking his access to Deloitte's transition website where the Plaintiff could apply for jobs at other firms. Upon information and belief, he was treated differently than similarly situated former employees who did not suffer from life threatening allergies and whose transition website access was not removed by the defendant.

## Discrimination by Apple based on Plaintiff's Medical Condition / Disability

49. By filing his court complaint against his previous employer Deloitte Consulting LLP in early February 2019, the plaintiff engaged in a protected activity. On his court complaint, currently pending in the Federal Court of the Southern District of New York, case# 1:19-cv-10578-AJN, the plaintiff identified that he was discriminated on the basis of his disability, gender, national origin and race, and was retaliated by Deloitte. The complaint was first filed in the state court in end of January 2019 and was later removed to Federal court around the middle of November 2019 by Deloitte.

50. In November 2019, the plaintiff applied for various positions within the Product Operations Group at Apple. On November 19th 2019, the plaintiff received an email notification from Apple recruiter, Caitie Wojdak. The email mentioned that plaintiff's profile was selected by Apple, and the iPhone Product Operations group that dealt with automation, Machine Learning, building out new tools and systems to enable global distribution of Apple products, was looking to add a data / machine learning Program Manager to their team.

51. The plaintiff was qualified for the position at all times and plaintiff's profile was selected by the Apple recruiter. From November 2019 to March 2020, the plaintiff had multiple telephone interviews/conversations and email correspondence with Apple Recruiter Caitie Wojdak, American Caucasian female, concerning various employment positions the plaintiff had applied for. The Apple recruiter, Caitie Wojdak, selected plaintiff's profile claiming that she really "liked plaintiff's background and work experience". She reached out to the plaintiff both over email and phone for various roles within the Apple Product Operations group.

52. On November 22nd 2019, the Apple recruiter, Caitie Wojdak, left a voicemail to the plaintiff from her phone number ending with 0210. In December 2019, the plaintiff had a short phone interview with the Apple recruiter for the Program Manager position. Apple recruiter Ms. Wojdak mentioned that the Apple hiring team reviewed plaintiff's profile, was interested in plaintiff's profile, and would be happy to consider his profile for multiple positions.

53. As a follow-up to the previous conversations about the Data / Machine Learning Program manager role and other open roles, on or about February 4, 2020, the plaintiff interviewed with

Ms. Wojdak. During the conversation, the plaintiff reminded the recruiter about their previous conversations, and the Apple recruiter told the plaintiff that she was extremely interested in recruiting the plaintiff, would consider him for a couple of positions, and would like to schedule the interviews as soon as possible.

54. During this interview, the plaintiff disclosed his disability and told the recruiter that he has filed a discrimination lawsuit against his previous employer Deloitte for discrimination and retaliation based to disability, race, national origin, and gender – and the lawsuit is currently pending in Federal Court Southern District of New York (S.D.N.Y.). The plaintiff felt that it would be reasonable to provide such information. The Apple recruiter requested the plaintiff to send in the additional information on his employment lawsuit, as well as any additional information on the plaintiff to match his profile to the other open roles at Apple.

55. During the February 4th interview, Ms. Wojdak appeared extremely interested in hiring the plaintiff, and she told the plaintiff that she would contact him and schedule interviews. On February 6, 2020, as requested, the plaintiff mentioned about his pending wrongful termination lawsuit to Ms. Wojdak via email. The Plaintiff welcomed the opportunity to connect over the phone on other open positions at Apple.

56. On February 7th 2020, the plaintiff left a voice mail to Ms. Wojdak. The plaintiff stated that his Federal Complaint against Deloitte can be searched on google, and the plaintiff also provided Ms. Wojdak with plaintiff complaint index number for expedited search. The plaintiff also provided further details on the allegations on the complaint.

57. Upon information & belief, miscreants from defendant Deloitte Consulting LLP, gained access to plaintiff's emails and phone conversation through illegal means, and likely coordinated and conferred with the Apple recruiter and exerted their influence to stall, disrupt and prevent the plaintiff from securing alternate employment. This is evident from the fact that Apple recruiter previously identified that she would like to schedule interviews as soon as possible, however, did not schedule them.

58. With benefit of hindsight and facing the same defendant Deloitte over a period of time, the plaintiff has recognized a pattern of specific mocking / harassment acts on the plaintiff. Minutes

after his call to Apple recruiter on February 7th 2020, plaintiff received several spam emails claiming *"red onion hair oil therapy"* which, upon information & belief, suggest the involvement of a specific defendant Deloitte employee with last name Rohde. This act was no different than some of the previous acts during plaintiff's employment, specially, in Aug. 2018, the Deloitte HR interjected with plaintiff's customary yearly bonus at Deloitte, and deprived him of his yearly bonus payout.

59. On February 16th 2018 as well as on March 6th 2018, the plaintiff clearly stated his allergy-based disability / medical condition to Joanna Rohde over a phone call. On February 16th 2018, the Plaintiff also provided Joanna with several witnesses for the January 10th 2018 event. Deloitte Talent employee (HR) Joanna Rohde had vested interest in an adversarial outcome on plaintiff's recruitment at Apple because of (a) her direct involvement and gender bias in plaintiff's sexual harassment and ethics complaint issues at Deloitte, (b) her knowledge of plaintiff's case and involvement of a Financial services Partner on the matters, (c) plaintiff's pending employment lawsuit on which she has been identified as an accused, (d) her own discrimination against the plaintiff based on his race.

60. On February 10th 2020, Apple recruiter sent an email to the plaintiff thanking him for the additional information, and informing him that his profile is again under review. Plaintiff was told that he would hear back from Apple. However, Ms. Wojdak did not contact the plaintiff. On or about February 19 and March 5, 2020, the plaintiff sent emails to Ms. Wojdak requesting for status of the interview and positions, but she did not respond.

61. On March 30, 2020, Ms. Wojdak sent an email stating that Apple would not be moving forward with plaintiff's recruitment and there were no genuine reasons given. Apple Recruiter did not provide any reasons for its actions. Such improper acts by Apple raise credibility issues because they were in sharp contrast to the past treatment of the plaintiff, where the Apple recruiter selected the plaintiff's profile as a member of the Apple hiring team, and stated she was extremely interested in plaintiff's profile.

62. On August 11th 2020, plaintiff held a 35-minute call with Equal Employment Opportunity Commission (EEOC) for requesting a letter for right to sue against Apple. The plaintiff recorded

the conversation. Nowhere in the recorded call with EEOC investigator did the plaintiff provide facts that suddenly appeared in EEOC draft of charge of discrimination. For example, the following fact was never stated on the call - *"on or about February 19th 2020, plaintiff sent an email to Ms. Wojdak requesting for status of plaintiff's application, but she did not contact me"*. However, the fact suddenly and out of no-where appeared on EEOC's draft notice of charge of discrimination against Apple in August 2020. Upon knowledge, belief and patterns of behavior, Deloitte Human Resource Professional Joanna Rohde, who previously disrupted plaintiff's recruitment at Apple, tracked plaintiff's communications with the EEOC, actively listened to plaintiff's call and gathered information from plaintiff's computer to coordinate with EEOC and further her self-interest on this case.

63. Apple's abrupt change of tone and direction on plaintiff's hiring after plaintiff's disclosure of his employment lawsuit, followed by Apple's refusal to hire the plaintiff provide a connection between Apple and Defendant Deloitte. Furthermore, (a) spam emails to the plaintiff sent to the plaintiff in a familiar pattern by Deloitte just after plaintiff's pending lawsuit disclosure to Apple, (b) the subsequent tampering of statements on plaintiff's EEOC charge of discrimination against Apple, Apple's proximity to the EEOC office and Deloitte Talent Relation Manager Joanna Rohde's surveillance of plaintiff's communications, suggest a connection between defendant Apple, defendant Deloitte and the EEOC investigator (Ms. Lisa B.) of the San Jose local EEOC office. These incidents were very specific and were more than episodic; they were sufficiently concerted to be deemed pervasive.

64. Because of the nature of the plaintiff's allegations on his Federal employment lawsuit, it is highly likely that Defendant Deloitte and Defendant Apple coordinated with each other or acted in concert to deny plaintiff's employment application at Apple. On his employment lawsuit, the Plaintiff has alleged that he was notified of a malicious sexual harassment allegation by a 62-year old White woman twice the age of plaintiff, and the same woman made inconsistent statements on her confidentially filed allegations on the issue. Deloitte conducted an incomplete and inconsistent investigation on the issue. Furthermore, Plaintiff has also recently alleged that there existed a female supervisor who was pregnant, and that defendant Deloitte must have known about such issues in 2018.

65. Because of the nature of facts on plaintiff's employment lawsuit, specifically, (a) the claims relating to plaintiff's male White and Non-White Supervisors and Colleagues on his employment lawsuit, and (b) the involvement of a White Female Apple Recruiter on the case, it is plausible that Apple refused to hire the plaintiff because Apple was <u>motivated</u> to "favor non-accused female applicants and employees at Apple over the accused male plaintiff" in order to demonstrate its commitment to protecting female applicants and employees from male sexual harassers.

66. Apple Recruiter knew about plaintiff's disability / medical condition. On or about February 4th 2020, the plaintiff specifically mentioned about his pending federal employment lawsuit against Deloitte and his disability / medical condition to the Apple Recuiter Caitie Wojdak both over phone on February 4th and February 7th 2020, and on February 6th 2020 over email.

67. Upon information and belief, similarly situated recruitment candidates, who did not suffer from allergic reaction and temporary disability caused when allergies get triggered, were considered for the full-time positions at Apple. These recruitment candidates or applicants went through Apple's recruitment process and were subsequently hired as full-time employees by Apple. These employees were neither discriminated nor retaliated by the Apple Recruiter on the basis of their medical condition or disability.

68. For the years 2019-2020, Plaintiff and a similarly situated to Apple female applicant, Jenna Kovalsky. Both plaintiff and Jenna had almost the same number of years of work experience. Previously, both plaintiff and Jenna performed almost similar work consisting of the same or similar duties, including, but not limited to product strategy or development, defining, leading and/or contributing to product marketing and product positioning in diverse products, building firm eminence, collaborating with and/or mentoring junior staff, etc. Both applicants were subjected to similar hiring standards, that screened for and required similar skill, effort, and responsibility for the same position at Apple 'Product Operations – Program Manager'. Jenna had a Bachelor's degree; however, the plaintiff had a Master's degree in addition to the Bachelor's degree. Jenna also lacked plaintiff's diverse work experience dealing with several clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

69. For the years 2019-2020, Jenna was hired as a Product Manager by Apple in January 2020, however, the plaintiff was not. Upon knowledge and belief, Jenna did not suffer from life-threatening allergies or disabilities, and did not have a pending employment lawsuit against her previous employer. Plaintiff had the additional experience of representing himself on an employment discrimination lawsuit in both State & Federal Court, however, applicant Jenna lacked plaintiff's experience with courts.

70. Apple singled out the plaintiff and treated the Plaintiff differently than similarly situated applicant, Jenna Kovalsky, an applicant who did not suffer from life-threatening allergies or disabilities. Jenna was finally hired by Apple as a fulltime employee in a Managerial position, while the plaintiff was not.

71. Similarly, after Apple refused to hire the plaintiff, Apple continued to seek applicants for multiple positions within the Product Operations group including the Program Manager position. Upon knowledge and belief, other situated applicants who did not suffer from life-threatening allergies or disabilities were hired by Apple. These employees included Albert Tsai, who was hired by Apple in March 2020, Dustin Mcgruder, who was hired in April 2020, Homer Chen, who was hired in May 2020, Michelle Ly, who was hired in June 2020, and so on.

## II.   Discrimination Based on Gender

### Discrimination by Deloitte based on Plaintiff's Gender

#### 2.1 Events Leading to Malicious Sexual Harassment Complaint

72. On Friday, December 15th 2017, the morning after his disability incident, plaintiff contacted Deloitte Financial Services Partner, Michael Fernandez, over phone. On the conversation, partner enquired whether plaintiff was okay, mentioned that plaintiff threw up in the hotel room several times and refused help. In reply, plaintiff apologized, mentioned about his medical condition, said that he was deeply embarrassed and did not remember the events clearly. This conversation is consistent with plaintiff's email sent to the partner immediately after the call. On

Friday, December 15th 2017, the Deloitte partner, Michael Fernandez, reported the incident internally to Deloitte Human Resource Managers.

73. On Monday, December 18th 2017, plaintiff received communications from a recruiting firm, Scotland Group, for a role at J.P. Morgan Chase U.S Financial Services Treasury team. Since plaintiff recently completed a project at Citibank for their Treasury and Capital markets team, and since he was scheduled for a J.P Morgan chase project in the U.K., plaintiff saw this call as chance to learn more about the business & opportunities at J.P. Morgan. Around 1:15 PM, plaintiff held 18-minute call with a Scotland Group recruiter. The plaintiff was released from his J.P Morgan Chase client project within the next hour of this call as mentioned in the following paragraph. Upon information, belief and pattern of behavior, this call was coordinated by Deloitte Human Resource team, likely by Talent Relations Manager, Joanna Rohde.

74. On Monday, December 18th 2017, at 2:07 PM plaintiff received a call from Christina Young about the J.P. Morgan Chase project which lasted for 38 minutes. On this call, Christina Young mentioned she had to release the plaintiff from the project as she was *"getting pressure from above"* (as mentioned on paragraph 21 of the complaint). Since plaintiff made arrangements for the U.K project and was doing so well, plaintiff pushed back and enquired further about his project release.

75. Christina Young said it "was very political", and she was told by plaintiff's resource manager that "if she did not release the plaintiff, she would get in trouble". Upon information & belief, at this point, Deloitte Human Resource Management team coordinated internally to have plaintiff's resource manager instruct Christina Young to get the plaintiff released from the project. Thus, the plaintiff was singled out and released from project, as opposed to similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, who did not suffer from life-threatening allergies and who were not released from projects based on their disability / medical condition.

76. On Tuesday, December 19th 2017, plaintiff held an in-person meeting with Christina Young and another female team member to transition his work so far on the J.P Morgan project. The fourth team member joined over the phone. Christina Young acted very professionally and amicably at this meeting.

77. Similarly, on January 10th 2018, plaintiff again briefly bumped into Christina Young at a holiday event. In this event, Christina Young said that her J.P Morgan project U.K trip was again delayed because the project sponsor "Mr. Richard" broke his bone on a skiing incident. Until this point, Christina Young behaved very professionally and amicably with the plaintiff, and there was no mention or sign of any malicious or indecent behavior from her side. This further suggests that the sexual harassment allegations filed by Christina Young after these events are false and malicious.

78. On January 11th 2018, late afternoon, Christina filed a malicious sexual harassment complaint against the plaintiff of inadvertently touching her behind at the January 10th 2018 holiday party. The allegations were filed as confidential and non-retaliatory, so the identity of the accuser was concealed, and no one could know allegations in their entirety, except the accuser Christina Young, and her interviewer Joanna Rohde. The plaintiff was neither informed nor interviewed about these allegations during his employment with the defendant.

79. On January 11th 2019, the event identified by Christina on her report was the January 10th 2018 holiday party, and not the December 14th 2017 holiday party. In fact, there were no reasons for Christina to make allegations on January 11th 2018 about the December 14th 2017 holiday event - which occurred almost a month before. Plaintiff was already released from the J.P Morgan Chase project on December 18th 2017 by Christina, per her own statements that she was getting "getting pressure from above", plaintiff met with Christina several times after that and Christina behaved amicably.

80. The plaintiff was singled out by Deloitte as against similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, Irma Arellano, who did not suffer from life-threatening allergies and who did not have a malicious sexual harassment allegation against them.

81. Deloitte's internal coordination and internal involvement in this matter is further evident from the fact that in early 2019, the defendant moved Christina Young, an employee with 25+ years of experience with stock market data in financial services industry, from Deloitte, and placed her as Chief of Staff to a Litigating firm. Upon information and belief, big corporates like Deloitte who actively scan court dockets, upon discovering plaintiff's complaint submitted to

the court, scrambled to move Christina to another employer. She was moved to another firm around the same time plaintiff's complaint was submitted to the New York Supreme Court (end of January 2019).

82.   In addition, Deloitte's coordination and internal involvement in this matter is further evident from the conversations between plaintiff's previous attorney and the defendant attorneys. Plaintiff has several recorded conversations with his previous attorney, Mr. Vandamme, where Mr. Vandamme clearly reiterates his conversations with defendant attorneys, who claim that Christina Young was still working at the defendant during the summer of 2019. However, after Mr. Vandamme's dismissal, defense attorneys wrongly stated in their communications to the plaintiff, and to the court, that Christina Young left Deloitte well before plaintiff's filed his lawsuit in the state court on February 1st 2019.

## 2.2 Firmwide Ethics & Integrity Training

83.   In around February, 2018, the Plaintiff took part in firm-wide ethics, integrity and compliance training. Specifically, Plaintiff reported that, though it was his duty to point out instances where projects were mismanaged and to suggest improvements, when he did so during a Fall 2017 project based in Los Angeles, he was threatened against raising such issues with supervisors in higher positions and learned it would '*obviously result in a bad rating*', he faced *unprofessional treatment* by his supervisor and *finally removed from the project* by his immediate supervisors.

84.   Specifically, the goal of plaintiff's ethics violation report was to report the disproportionately heavy workload assigned to the plaintiff on the project, discriminatory workplace conduct and request correct performance evaluation on plaintiff's project work. Based on the firm-wide ethics training, as duly reported to HR in early February 2018, the plaintiff was given the responsibility of taking on two-full time roles on the project by his supervisors, in an industry where plaintiff had no experience at all. After receiving plaintiff's ethics violation report, the firm immediately took steps mentioned below to reduce their legal liability on the issue.

85.   After receiving plaintiff's ethics report, unbeknownst to the plaintiff, as explained below, first, the firm tried a discriminatory reason to illegally control the plaintiff by issuing a malicious letter of reprimand based on his medical condition and disability, and threatened him with termination,

when that did not work, the firm Deloitte Consulting llp falsely engineered a non-discriminatory reason to illegally control the plaintiff by giving him permanently poor performance rating. Plaintiff was singled out, and treated differently than similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, Irma Arellano, who did not suffer from life-threatening allergies, and who did not have a malicious sexual harassment allegation against them.

### 2.3 Malicious Sexual Harassment Complaint

86. On January 11th 2018, more than three weeks after plaintiff's anaphylaxis event *(which occurred on December 14th 2017)*, a 61-year old woman employee of the defendant, Christina Young, filed confidential allegations against the plaintiff with Defendant Human Resource professionals for getting drunk and inadvertently touching her backside at a holiday party. This allegation was never mentioned to the plaintiff during his employment, and Plaintiff learned about this allegation in its entirety in mid-2019 after receiving defendant's discovery response.

87. In early January 2018, plaintiff got staffed and started on an internal firm development Mergers and Acquisitions (M&A) growth accelerator project at Deloitte. Plaintiff's female team members, Karma Porter, Fanzi Mao Pitzer, Tanya Srivastava were very pleased with plaintiff's background and skillset. However, on January 12th 2018, one day after Christina Young filed her falsified allegations, plaintiff's female resource manager, Amye Hanes, directed the M&A team to immediately release the plaintiff from the project. Not knowing the background, both Plaintiff and his female colleagues on the project were stunned and greatly moved by Deloitte management's interference and decision. Defendant as such singled out the plaintiff, discriminated against him on the basis of his gender on the basis of a malicious sexual harassment allegation, harassed him, and forestalled his professional and career growth.

88. On January 18th 2018, a Defendant's female Human Resource Professional, Katie Tiller Wittenbraker, had a discussion about Christina Young, and the plaintiff, as documented in her notes. Katie Tiller Wittenbraker quoted *"They would have meetings setup, and Tina would try to find him in office and would find him with the client, and having the meeting with the client without her present"*. In reality, the plaintiff had no such meetings as the client project, which was due to start in London, did not even start. This is consistent with allegations mentioned on paragraph 21 of the complaint, which state that the plaintiff was released from the JP Morgan

Chase project on December 18th 2017 before it even started. Defendant as such singled out the plaintiff, filed falsified allegations against him, discriminated against and victimized the plaintiff on the basis of his gender, harassed him, forestalled his professional and career growth.

89. In January and February 2018, on her follow-up interrogatory calls with Deloitte Human Resource Professionals, elderly woman employee Christina Young, first stated that touching her backside incident happened on January 10th 2018. Then on a call on February 27th 2018, she changed her statements, and stated that the incident happened at the December 14th 2017 event, and she got the dates confused. In contrast, however, on December 14th 2017, the plaintiff suffered a serious life-threatening anaphylactic reaction at the event and became unconscious. Secondly, on January 10th 2018, plaintiff attended the event for just 40-50 minutes. Plaintiff has call records to prove his location, and has produced supporting witnesses to prove that he was sober. Christina Young's change of date statements were made a month after the plaintiff produced his supporting witnesses for the January 10th event.

90. Similarly, on her interrogatory calls with Deloitte Human Resource Professionals, Christina Young mentioned that the incident happened on January 10th 2018 and Deloitte leader Brian Johnston attended the same event. However, Brian Johnston, Deloitte Strategy & Operations (S&O) service line leader, was neither invited to the January 10th 2018 event, which was sponsored by Deloitte Analytics and Information management (AIM) team, nor did he attend. Similarly, Christina also mentioned that Deloitte Financial Services Sr. Manager KP Parekh attended the same event. However, KP Parekh was neither invited to the December 14th 2017 event, nor did he attend. As a matter of fact, the plaintiff clearly remembers Christina Young introducing him to KP Parekh for the first time at the January 10th 2018 event. This further suggests that the sexual harassment allegations by Christina Young were malicious.

91. During the internal investigation with Joanna Rohde, Christina claimed that "*plaintiff's hand would brush against her butt*", that she had a "*large butt*" and the "*incident was not intentional in any way*". Here, Christina did not accuse plaintiff of just any misconduct; she accused him of sexual misconduct. That choice is significant, and it suggests that plaintiff's sex played a part in her allegations. A rational finder of fact could therefore infer that such an accusation was based, at least in part, on plaintiff's sex as these allegations would not have been made if another female

inadvertently touched Christina. Thus, Plaintiff's sex was a <u>motivating</u> factor in the discrimination, that is, plaintiff's adverse employment action was based, in part, on gender discrimination.

92. Christina Young, as such, used and abused the very law that is meant to protect her as a female, as a weapon against the plaintiff. Defendant as such singled out the plaintiff, discriminated against him on the basis of his medical condition and gender, filed internal falsified allegations against the plaintiff but never informed or interviewed the plaintiff, and later threatened him with termination, and supported a female Deloitte professional in her false claims against the plaintiff.

### 2.4 <u>Malicious Letter of Reprimand and Gender discrimination</u>

93. In Feb. 2018, after receiving plaintiff's ethics and integrity violation report, defendant Human Resource professionals panicked. At this point the firm knew that, (a) Plaintiff had a medical condition and was unconscious, (b) Senior Partner from the firm were involved in plaintiff's matter, (c) Joanna Rohde, Manager, Talent Relations, had retaliated against the plaintiff by releasing him from the J.P Morgan project, (d) defendant financial services leadership had retaliated against him by sending him to interview for a project where he was destined not to be hired, (e) plaintiff had a malicious sexual harassment complaint against him, (f) plaintiff filed an ethics and integrity violation report with defendant Talent Relations on disproportionately heavy workload.

94. In order to maintain an illegal control of the plaintiff and avoid punitive damages in the case, the defendant hatched a scheme to issue a malicious letter of reprimand to the plaintiff. On February 16th 2018, Deloitte Partner Deborshi Dutt and HR Professional Brenda Arends wrongly accused the plaintiff for being inebriated at two different events, threatened him to immediately sign a letter of reprimand within 2-days or face termination. However, Plaintiff talked about his underlying medical condition for the first event, and produced several witnesses against defendant's claims stating that he was sober for the second event. The witnesses were interviewed by the defendant HR.

95. The defendant knew that it has provided a false and malicious letter of reprimand to the plaintiff, and since the plaintiff had produced witnesses to support his innocence, the firm has further exposed another partner, Deborshi Dutt, and the firm on the issue. Upon knowledge and belief, the defendant, in urgent need to save itself from any legal liability, (a) hatched another malicious scheme by adding false references on Senior Manager K.P Parekh's presence at the Dec. 14th event, as he was not present at the Dec. 14th event; and (b) later coordinated internally to support Christina Young's testimony by helping her change the dates on her testimony by stating she got the dates confused Dec. 14th 2017 vs. Jan. 10th 2018. Similarly situated employees to the plaintiff, like Youmna Saloumi, Adrienne Moorefield, who did not have a malicious sexual harassment allegation against them, were not subjected to such discriminatory behavior and retaliation.


## 2.5 Discrimination and Retaliation based on Protected Characteristics of Women

96. Deloitte employees Joanna Rohde, Katie Tiller WittenBraker, Brenda Arends, Amye Hanes, Shanah Setzen, Ashley Scorsatto and Sai Hampankatta were plaintiff's human resource professionals or supervisors, and their supervisory oversight suggests that they had input in the final decision of plaintiff's termination.

97. Upon knowledge & belief, defendant Deloitte Consulting LLP knowingly discriminated and retaliated against the plaintiff on the basis of a protected characteristic or factor of a female employee. The defendant knew of the protected characteristic or factor of a female supervisor employee, that the employee is pregnant, and knowingly instituted malicious allegations against the plaintiff and knowingly assigned the plaintiff a negative performance rating.

98. The defendant Deloitte Consulting LLP and plaintiff's Human Resource supervisors like Joanna Rohde and Brenda Arends knew about the protected characteristic or factor of a female employee, and based on it knowingly instituted a discriminatory bias against the plaintiff based on his race. The plaintiff was released from multiple projects, and was replaced on more than one project with a white employee.

99. Until the time of filing this complaint, Defendant Deloitte Consult LLP has indulged in fraudulent concealment of material facts, and has not disclosed facts on the matters to the plaintiff. These fraudulent concealment of material facts are sufficient to toll the running of the statute of limitations against Deloitte and provide the plaintiff a right to file an amended complaint in future. Deloitte has disregarded plaintiff's discovery requests under the Federal Rules of Civil procedure and has not disclosed such information.

100. Upon knowledge and belief, Deloitte has moved several employees named on plaintiff's employment lawsuit to other firms. Beginning February 2021, after moving several employees to other firms, upon knowledge and belief, Deloitte female HR professionals targeted the plaintiff with messages about this protected characteristic or factor, (a) in part to boast about their own internal concealment of facts, (b) in part to mock the plaintiff on the malicious sexual harassment allegation on which a female employee twice as old as the plaintiff claims to have a "*large butt*", and (c) in part to boast their own corroboration with female supervisors and human resource professionals who targeted the plaintiff not only by terminating his employment through wrongful means, but also by instituting recruitment fraud against him.

101. Deloitte white Human Resource professionals, Brenda Arends, Joanna Rohde, Shanah Setzen and/or Amye Hanes maintained their discriminatory intent as they favored White employees like Christina Young, Ashley Scorsatto, Emerson Marenyi, Morgan Carlson, Tim Van Ee more than the plaintiff. Their supervisory oversight over the malicious sexual harassment allegation and protected characteristic or factor of women such as pregnancy suggests that they had input in the final decision of plaintiff's termination

102. Plaintiff was assigned disproportionately heavier workload than similarly situated employees. Upon information and belief, similarly situated US based white employees with similar responsibilities like Adrienne Moorefield, Morgann Carlon and Irma Arellano, were not as heavy workload as the plaintiff, were not released from multiple projects, and were not given a bad performance rating due to his gender, race or national origin.

103. Defendant Human Resource Professional Joanna Rohde drafted a malicious letter of reprimand that falsely accused the plaintiff and threatened him with termination, however, the plaintiff

produced witnesses against this retaliatory act. After the plaintiff produced witnesses, the defendant employee Joanna Rohde knew that on January 11th 2018, Christina Young had made false allegations against the plaintiff for the January 10th 2018 event.

104. The sequence and timing of the events suggest that Joanna Rohde showed her discriminatory bias against the plaintiff based on his gender as she (a) coordinated with HR Amye Hanes to release the plaintiff from the JP Morgan Chase project, (b) architected a malicious letter of reprimand against the plaintiff, (c) did not follow the defendant's own processes and protocols of informing or interviewing the plaintiff on the malicious sexual harassment allegation, (d) concealed the identity of the accuser, Christina Young, and information about her retaliation history at JP Morgan Chase, (e) treated Christina Young's more favorably by not investigating her malicious allegations, (f) requested plaintiff's release from 21st Century Fox and Bausch Health projects, (g) upon information & belief, helped place Christina Young as Chief of Staff to a litigating firm. Similarly situated employees to the plaintiff, like Youmna Saloumi, Adrienne Moorefield, who did not have a malicious sexual harassment allegation against them, were not subjected to this discriminatory behavior which was mainly based on plaintiff's gender.

105. In early January and February 2018, the Defendant female Human resource professions Joanna Rohde, Katie Tiller WittenBraker knew that there existed a sexual harassment allegation against the plaintiff, and the plaintiff needs to be knowing assigned false negative performance rating, a legitime non-discriminatory reason, to limit the liability of the firm. On February 8th 2018, the plaintiff completed his firmwide Ethics training. Deloitte knew about the sexual harassment issue, knew plaintiff was required to take an ethics training and knew about the protected characteristic of another female supervisor. In order to conceal facts and limit the firm liability, the female supervisors and human resource professionals coordinated internally.

106. The firm waited until February 9th 2018, to have plaintiff's supervisor Ashley Scorsatto assign the negative project performance rating to the plaintiff, such that the rating may not be challenged on the basis of the malicious sexual harassment allegation which purportedly was alleged to have occurred on January 10th 2018. Previously, Ashley assigned the plaintiff disproportionately heavy workload outside of his skillset or expertise, and her actions such as

waiting until February 9th 2018 to assign the plaintiff a negative performance rating in coordination with Ms. Katie Wittenbraker provide an inference for gender-based discrimination.

107. Defendant Deloitte's internal coordination on the issue is evident. Joanna Rohde, Katie Tiller WittenBraker and Ashley Scorsatto were plaintiff's supervisors, and their supervisory oversight suggests that she had input in the final decision of plaintiff's termination. Ashley had previously maintained a racial animus against the plaintiff and assigned him with disproportionately heavy workload. These HR employees and supervisors aided and abetted each other due to the malicious sexual harassment issue and the existence of other female protected characteristics such as pregnancy.

108. On February 27th 2018, Christina Young and Human Resource professional Joanna Rohde exchanged email communications with several inconsistencies which further show defendant's involvement and coordination with Christina Young. The first email was sent by Joanna Rohde to confirm the date, location and details of the incident with Christina Young. This email request was sent by Joanna at 2:20 PM, however, it was replied by Christina Young six minutes earlier at 2:14 PM - which is factually not possible.

109. On February 27th 2018, Christina Young and Joanna Rohde exchanged email communications with several inconsistencies which further show defendant's involvement and coordination with Christina Young. The second email was sent by Joanna Rohde to confirm whether the incident happened on January 10th 2020 per Christina's earlier testimony, or whether it happened on December 14th 2020. The email was sent by Joanna Rohde at 5:39 PM and replied by Christina Young within two minutes at 5:40:39. Christina Young, a 62 year old female employee, who requires glasses to read information on the computer, could not have replied and typed her email message reply within 2-minutes unless she was aware of the upcoming email request and the contents. Plaintiff has personally worked with Christina, who is not an extremely proficient computer user, and requires time to open and reply to emails.

110.     On January 11th 2019, the event identified by Christina on her report was the January 10th 2018 holiday party, and not the December 14th 2017 holiday party. In fact, there were no reasons for Christina to make allegations on January 11th 2018 about the December 14th 2017 holiday event - which occurred almost a month before. Plaintiff was already released from the

J.P Morgan Chase project on December 18th 2017 by Christina, per her own statements that she was getting *"getting pressure from above"*, plaintiff met Christina several times after that and Christina behaved amicably. Upon knowledge and belief, Deloitte Financial Service team, Partner Michael Fernandez and Joanna Rohde collaborated internally with plaintiff's Resource Manager Amye Hanes to instruct Christina to release the plaintiff from the JP Morgan project on December 18th 2018.

111. On February 16th 2018 as well as on March 6th 2018, the plaintiff clearly stated his allergy-based disability / medical condition to Joanna Rohde over a phone call. On February 16th 2018, the Plaintiff also provided Joanna with several witnesses for the January 10th 2018 event. After the plaintiff produced witnesses on February 16th 2018, Joanna knew that Christina had made a false allegation. In order to save herself, Joanna Rohde, the firm Deloitte Consulting LLP and the financial services partners from liability, Joanna likely corroborated with Christina Young and to help her provide inconsistent statements on the sexual harassment issue.

112. In order to conceal her false letter of reprimand that falsely identified the plaintiff of being inebriated on two occasions, it is reasonable to believe that Deloitte had no choice but to collaborate with Christina on the issue. Orchestrating inconsistent statements directly helped the firm Deloitte, Partner Michael Fernandez, HR professionals Joanna Rohde and Amye Hanes, and employee Christina Young limit their direct involvement and liability on plaintiff's disability / medical condition and sexual harassment issues.

113. Thus, Christina Young was getting help from other defendant employees – likely from HR professional Joanna Rohde; and the date change for the incidents was likely made to protect the interests of Christina Young, Joanna Rohde, the Financial Service Team and the firm in the case. Joanna further acted under the color of law to conceal all such information on the malicious sexual harassment allegation from the plaintiff and about the protected characteristics and factors of women supervisors.

114. This was done in order to conceal defendant's direct involvement on the issues such as (a) FSI Partner's direct knowledge of plaintiff's disability / medical condition in Dec. 2017, (b) Joanna's involvement on plaintiff's release from the J.P Morgan Project the very next day, (c) defendant's

discrimination against the plaintiff on the basis of protected characteristics / factors of other female employees in 2018. Defendant's treatment of the plaintiff, including instances of racial harassment, and bias such as moving Christina as Chief of Staff to a litigating firm around the same time plaintiff filed his court complaint provide a pretextual reason for discrimination.

115. Plaintiff would not have suffered an adverse employment action at Deloitte, his termination, if the plaintiff (a) was not discriminated on the Anthem project based on his national origin and race and was not given disproportionately heavy workload by his white supervisor for which he filed an ethics report, (b) was not released from the JP Morgan Chase project because he was helped for his disability incident by a White Sr. Partner, (c) was not sent to interview for a project where he was destined not to be hired due to lack of relevant experience, (d) was not accused by his White supervisor of buying an airplane ticket without her approval, (e) was not falsely accused by a 61-year old White female of inadvertently touching her behind, (f) was not treated less favorably than the female accuser, (g) was not informed or interviewed about the malicious sexual harassment case.

116. Based on the above allegations, one may deduce that because of plaintiff's national origin and race, as he was non-White, his White female Supervisors and Human Resource Managers – Ashley, Christina, Joanna, Brenda, Katie, Amye, and Shanah – maintained a racial bias against the plaintiff and treated the plaintiff differently than similarly situated employees. Plaintiff was as such singled out and treated differently than similarly situated employees like Adrienne Moorefield and Morgan Carlson based on his race and national origin. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

117. Similarly, Plaintiff would not have suffered an adverse employment action, his termination, if the plaintiff (a) was not released from projects and replaced by someone outside his protected class, (b) was not assigned short-term projects where plaintiff had no industry knowledge or experience, (c) was not deprived of project opportunities where he had the right skillset, (d) was not given a permanently bad performance rating, (e) was not given less favorable performance evaluation than his White Colleagues, (f) was not subjected to invidious actions and comments by his White supervisors. Thus, plaintiff was treated differently than similarly situated White

employees, and the timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

118. Plaintiff's white supervisors and colleagues (a) released him from projects and sent him on projects where he was destined not to be hired, (b) accused the plaintiff of buying an airplane ticket without approval, (c) accused the plaintiff with impermissible bias of inadvertently touching the behind of a 62-year old woman, (d) treated the female accuser more favorably than the plaintiff, (e) replaced the plaintiff with a white employee more than once, and (f) sabotaged plaintiff's personnel file. Thus, defendant maintained a discriminatory bias against the plaintiff on the basis of his national origin and race.

119. In addition, plaintiff was subjected to a constant drumbeat of ridicule, (a) that his white supervisors and colleagues made racially insensitive remarks - plaintiff was called "deplorable" and "expendable Indian" - while his white colleagues were not, (b) that his white colleagues received favorable performance evaluations while plaintiff did not, (c) that his white colleagues were not restricted on seeking new client projects while several of plaintiff's applications were rejected with reason 'Project Closed Not Selected', (d) that similarly situated employees did not have to go through the ordeal of getting released multiple times from multiple projects while the plaintiff was. Thus, defendant maintained a discriminatory bias against the plaintiff on the basis of his national origin and race, and plaintiff was subjected to different workplace standards than his white supervisors and colleagues.

120. On March 6th 2018, less than two months after the filing of the malicious sexual harassment allegation against the plaintiff, defendant released the plaintiff from the 21st Century Fox Channel project. Defendant replaced the plaintiff with a less qualified White junior employee with just 1.5 years of experience, Emerson Marenyi, an employee of Caucasian background claiming him to be a subject matter expert. The defendant treated Emerson Marenyi more favorably than the plaintiff. Such repeated harassments by the defendant interfered with plaintiff's job performance. Upon information & belief, this release was planned by Deloitte Human Resource Manager Joanna Rohde, who called the plaintiff shortly after his project release meeting. Her discriminatory bias is evident as she had been meaningfully involved and working

behind the scenes in the process leading to and following plaintiff's malicious sexual harassment allegations and plaintiff's ethics complaint

121. On February 23rd 2018, the plaintiff held a call with his Citibank project team leadership Aditi Shankar and Rushika Patel. Deloitte Female Managers Aditi and Rushika thoroughly checked all of plaintiff past project performances and references said '*it was great to have the plaintiff onboard and they look forward to working with plaintiff*. During plaintiff's Pfizer project, Sr. Manager Patrick McBrearty praised the plaintiff multiple times in front of multiple client and Deloitte stakeholders. This is consistent with an email that Patrick sent to the plaintiff in Mid-April 2018, on which Patrick requested whether the plaintiff was again interested in working with him on a project. However, by providing inconsistent statements on the matter, defendant Deloitte Consulting LLP again appears to have indulged in tampering of evidence on this matter.

122. Specifically, On February 23 2018, the Deloitte Citibank team asked the plaintiff to provide references at 1:05 PM, and the plaintiff responded to the email at 1:40 PM EST with references of his past project leaders. However, Deloitte production of documents state that Deloitte Citibank team reached out to Sr. Manager Patrick McBrearty on the same date at 12:45 PM, which is factually not possible because the Plaintiff had not provided them with Patrick's information before 1:40 PM EST.

123. On February 23 2018, at 8:33 PM the Citibank team confirmed the plaintiff for the project after checking and verifying the references provided by the plaintiff, which essentially means that a negative reference is out of question here. The defendant Deloitte recently produced this evidence to the plaintiff on April 2nd 2021, and inconsistent statements made by Sr. Manager Patrick McBrearty appear to be tampered. Upon knowledge and belief, this tampering of evidence has been done by defendant HR Joanna Rohde to reduce her own liability and the liability of firm Partner Michael Fernandez on the matter, and to conceal her own mishandling of the sexual harassment allegation and plaintiff's ethics complaint.

124. In fact, Sr. Manager Defendant Patrick McBrearty and Partner Aditya Kudumala praised the plaintiff for his performance at the short three (3) week project at Pfizer. The plaintiff was praised by is Sr. Manager Defendant Patrick McBrearty in front of clients, and also by the client in front of the Sr. Manager. Such supervisor and client appreciations are important to note because they

were earned solely on the basis of plaintiff's effort and excellence on the project, when in fact, the defendant Deloitte Consulting LLP failed to train the plaintiff prior to this Pfizer Client project – a project on R&D Operative Modeling Transformation that was outside of plaintiff's skillset. In Mid-April 2018, Sr. Manager Patrick requested whether the plaintiff was again interested in working with him on a project. Defendant Deloitte appears to be tampering evidence on the case, and the rationale behind such actions highlight that defendant's proffered reason to knowingly assign a negative performance rating to the plaintiff were pretextual.

125. Partner Michael learned about plaintiff's disability in mid-December 2017, and HR Joanna Rohde coordinated internally to have the plaintiff released from the JP Morgan Chase project. It appears that the defendant has (a) forced a Sr. Manager who has a heart condition and suffered a heart attack to assign the plaintiff a negative performance rating, and (b) coordinated with plaintiff's Anthem project leader Ashley Scorsatto such that plaintiff was assigned a false negative rating which was not registered on the system until after the plaintiff completed his firm wide ethics training on February 8th 2018. These events suggest that defendant Deloitte has indulged in fraudulent concealment of facts and fraudulent tampering of evidence to conceal the involvement of Partner Michael Fernandez and Joanna Rohde. Defendant singled out the plaintiff and the plaintiff was discriminated against similarly situated employees who did not have a disability / medical condition and sexual harassment allegation against them.

## 2.6 Further Allegations Malicious Sexual Harassment Complaint and Defendant's Gender Bias against the plaintiff

126. The defendant was motivated by gender-based bias because the defendant did not follow their own processes and protocols of interviewing the accused witness, in this case the plaintiff, on the malicious sexual harassment allegation during his employment at Deloitte Consulting LLP. Defendant Deloitte did not provide any of these procedural protections to the plaintiff.

127. Defendant Deloitte further singled out the plaintiff, discriminated and retaliated against him on the basis of his medical condition / disability for defending himself with proof of his medical condition and identifying several witnesses of being sober at the alleged second incident; and further discriminated and retaliated against him on the basis of a malicious sexual harassment

allegation by (a) failing to follow its own process and procedures of not interviewing any potential witnesses, (b) failing to further investigate Christina's malicious allegations, (c) issuing a malicious letter of reprimand to the plaintiff and threatening plaintiff with termination, (d) by harassing him and filing falsified allegations against the plaintiff.

128. Both plaintiff and Christina Young were subjected to the similar employment conditions, at the same establishment in the same geographic location. However, defendant treated Christina Young more favorably than the plaintiff. (a) Defendant waited for three weeks to interview Christina on her malicious complaint until she started a new project, (b) defendant concealed her identity by filing her malicious complaint as confidential and non-retaliatory, (c) defendant did not inform or interview the accused (the plaintiff) on the issue. Furthermore, upon information and belief, (d) Christina was not released from several projects like the plaintiff, and (e) was not mocked and/or harassed by her supervisors.

129. Upon information & belief, defendant favored the accusing female over the accused male in order to internally demonstrate a commitment to protecting female employees from male sexual harassment. Further, bias is evident from the fact that a majority of Deloitte Human Resource professionals are females, and plaintiff's malicious sexual harassment allegations were discussed internally with females without disclosing the identity of the female accuser. Thus, defendant maintained a sex-based discriminatory intent over the plaintiff. Defendant as such singled out the plaintiff, treated the female accuser more favorably than the plaintiff, harassed him, and forestalled his professional and career growth.

130. Similarly, both plaintiff and Christina young were subjected to the similar employment conditions, at the same establishment in the same geographic location. However, defendant treated Christina Young more favorably by moving her as Chief of Staff to a litigating firm, while at the same time, intentionally harassing the plaintiff by orchestrating recruitment fraud against the plaintiff and by blocking his access to the Deloitte transition website. Defendant as such singled out the plaintiff, terminated his employment, treated the female accuser more favorably than the plaintiff, harassed him, and forestalled his professional and career growth.

131. The sequence and timing of the events suggest that Joanna Rohde showed her discriminatory bias against the plaintiff based on his gender as she (a) coordinated with HR Amye Hanes to

release the plaintiff from the JP Morgan Chase project, (b) architected a malicious letter of reprimand against the plaintiff, (c) did not follow the defendant's own processes and protocols of informing or interviewing the plaintiff on the malicious sexual harassment allegation, (d) concealed the identity of the accuser, Christina Young, and information about her retaliation history at JP Morgan Chase, (e) treated Christina Young's more favorably by not investigating her malicious allegations, (f) requested plaintiff's release from 21st Century Fox and Bausch Health projects, (g) upon information & belief, helped place Christina Young as Chief of Staff to a litigating firm. Similarly situated employees to the plaintiff, like Youmna Saloumi, Adrienne Moorefield, who did not have a malicious sexual harassment allegation against them, were not subjected to this discriminatory behavior which was mainly based on plaintiff's gender.

132. Christina Young was plaintiff's supervisor on the J.P Morgan Chase project and other internal firm initiatives. Her supervisory oversight suggests that she had input in the final decision of plaintiff's termination. Joanna Rohde was plaintiff's talent relation officer in this case. Her role included responsibilities to coordinate complex legal issues within the HR, and in turn protect the firm from lawsuits and punitive damages. Her supervisory oversight suggests that she had input in the final decision of plaintiff's termination.

133. Plaintiff's employer took an adverse action against plaintiff, that is treated similarly situated employees differently than the plaintiff and terminated his employment, in response to allegations or acquisitions of sexual misconduct and following a clearly irregular investigative or adjudicative process. The evidence substantially favored the plaintiff, but the evaluator, Joanna Rohde, a female, without an apparent reason based on the evidence, formed an opinion and/or a conclusion in favor of the female accuser. Thus, furthering providing an inference that the evaluator has been influenced by gender bias.

134. Similarly, defendant decision-makers choose to accept an unsupported accusatory version of the accuser over that of the accused, and declined even to explore the testimony of the accused witnesses (the plaintiff), thus giving further plausible support to the proposition that they were motivated by gender bias. The defendant decision-makers provided the plaintiff with a malicious letter of reprimand and were hostile towards the plaintiff. For example, on February 16th 2020, after the call with plaintiff where he was presented a malicious letter of reprimand, the defendant

Human Resource executive Joanna Rohde recommended that the "*plaintiff should focus on moving forward*", inferring that the plaintiff should be encouraged to leave the firm or retaliated against so that he himself leaves the firm, and plaintiff Human Resource supervisor Brenda Arends agreed. Plaintiff was never informed of such ill intent by the defendant. This further shows that Joanna used other human resource professionals within Deloitte to further her discriminatory bias against the plaintiff, and defendant's post-hoc non-discriminatory performance-based decision to terminate the plaintiff was pretextual.

135. After these events, the defendant human resource professionals decided to falsely engineer a non-discriminatory reason to illegally control the plaintiff by giving him permanently poor performance rating. The defendant retaliated against the plaintiff by (a) by placing him on business confirmed low performer list in spite of his good work and recommendations by Deloitte and Client leadership, (b) by falsifying his personnel file, (c) by subjecting him to different standards of project selection, and (d) by finally terminating his employment based on performance. Similarly situated employees to the plaintiff, like Youmna Saloumi, Adrienne Moorefield, who did not have a malicious sexual harassment allegation against them, were not subjected to such discriminatory behavior and retaliation.

136. For the years 2016-2018, Plaintiff and a similarly situated employee, Youmna Saloumi, female Senior Consultant, Deloitte Strategy and Analytics, New York, performed similar work consisting of the same or similar duties including, but not limited to advising clients, leading and/or contributing to client work or projects, building firm eminence, contributing to internal firm initiatives and client proposals, collaborating with and/or mentoring junior staff, etc. They both were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment and in the same geographic location. Youmna was subject to the same standards of governing performance evaluation and discipline as the plaintiff. Youmna did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation filed against her or was not retaliated or discriminated against due to the existence of a pregnant supervisor.

137. Similarly, for years 2017-18, Plaintiff was similarly situated to Adrienne Moorefield and Irma Arellano, both female Senior Consultants with similar position that required similar skill, effort, and job responsibilities as mentioned above at Deloitte Strategy and Analytics, New York.

Adrienna and Irma were subject to the same standards of governing performance evaluation and discipline as the plaintiff. These similarly situated employees did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation against them.

138. After the defendant became aware of plaintiff's medical condition / disability and malicious sexual harassment allegations, Plaintiff was subjected to different standards of performance evaluation and was given a permanently bad performance rating. However, similarly situated female employees, Youmna Saloumi, Adrienne Moorefield and Irma Arellano, who did not suffer from life-threatening allergies or disabilities and did not have a malicious sexual harassment allegation against them, did not receive biased performance evaluation, were not given a permanently bad performance review, and were not wrongfully terminated on the basis of performance by the defendant. Defendant as such singled out the plaintiff, treated him differently than similarly situated female employees, harassed him, and forestalled his professional and career growth.

139. After the defendant became aware of sexual harassment allegations against him, the defendant sought to intimidate, harass and retaliate against the plaintiff (a) by not informing or interviewing him about the false sexual harassment allegation, (b) by issuing him a malicious letter of reprimand, and (c) by giving him a permanently bad performance rating. The upon information and belief, the defendant carried out an ongoing scheme to intimidate, harass and force the plaintiff out of the company because it also knew that it would be illegal to terminate the plaintiff on the basis of a malicious sexual harassment allegation as the plaintiff would eventually find out and claim discrimination and retaliation. So, the defendant falsely engineered a non-discriminatory performance-based reason to terminate the plaintiff, in spite of plaintiff's good performance, denied him material benefits based on performance such as his customary yearly compensation increase, yearly bonus and/or promotion, and eventually terminated his employment by tagging him as a low performer.

140. In early February 2018, after learning the details of plaintiff's malicious sexual harassment case, the highly biased and discriminatory defendant female Human Resource (HR) managers, knowingly, wantonly and mercilessly decided to give the plaintiff permanently poor performance rating. Deloitte HR ignored plaintiff's good performance reviews and wantonly

placed the plaintiff on business confirmed low performer list, in part to protect their own interests given their own retaliation against the plaintiff, in part to protect the partners, Michael Fernandez and Deborshi Dutt, from any potential legal liability or claims, and in part to protect the firm from any potential legal liability or claims.

141. Plaintiff was given a permanently poor performance by the Human Resource Professionals, Joanna Rohde who had supervisory oversight over plaintiff's malicious sexual harassment case, and Brenda Arends who was a decision maker in plaintiff's termination. This was done despite plaintiff's good work during the 2017-18 performance cycle, despite the appreciations and recommendations he received from both Deloitte and Client leadership, and despite plaintiff's raising an ethics issue for his Anthem project. Defendant as such singled out the plaintiff, discriminated against him for defending himself with proof of his medical condition, discriminated against him by not performing proper investigation or due-diligence on the malicious sexual harassment allegation, and forestalled his professional and career growth.

142. Soon after the defendant became aware of plaintiff's medical condition / disability in December 2017, and Christina Young's allegations on January 11th 2018, during the course of next several months, various female Deloitte Human Resource Professionals and female Deloitte professionals began abusing their position and authority against the plaintiff on the basis of his gender. See further factual allegations in this regard in the examples below.

143. On February 16th 2018, on his call with Defendant's female Human Resource Manager Brenda Arends, plaintiff stated that "he has a medical condition, he had less than 2 drinks and his physician said that drinking alcohol on empty stomach likely exacerbated his underlying medical condition." This is consistent with the medical reports produced by the plaintiff as evidence. In contrast, Brenda Arends altered plaintiff's statements and wrote in her note that "plaintiff stated he had 2-3 drinks and his physician stated he got so drunk because he was drinking on empty stomach," thus changing the context and meaning of the entire conversation. This shows that defendant, Deloitte Consulting LLP, is being represented by extremely biased and discriminatory female Human Resource (HR) managers such as Brenda Arends, who wantonly & mercilessly discriminated against the plaintiff due to his medical condition / disability, on terms or privileges of his employment because he was a male and refused to sign her fabricated

letter of reprimand [id at 30], and given another female employee's falsified sexual harassment allegations against the plaintiff at the height of the "Me Too" movement in 2018.

144. On March 6th 2018, Plaintiff stated to the Defendant's female Human Resource Manager Joanna Rohde that "he has allergies of active nature, he carries an Epipen, he consumed alcoholic beverage at the event, he blacked out and likely suffered an anaphylactic reaction." [*Anaphylaxis could have resulted from alcohol, other ingredients in the alcoholic beverage including coloring agents, preservatives and/or from exacerbation of his underlying medical illness.*] In contrast, however, Joanna Rohde herself drew a direct conclusion and wrote in her notes that the "plaintiff's doctor said plaintiff is allergic to alcohol.". Thus, the Deloitte Human Resource professional knowingly captured selected piece of information to their advantage, discriminating against the plaintiff and his privileges of employment on the basis of his gender, and in light of the given falsified sexual harassment allegations.

145. Defendant's female Human Resource Manager, Brenda Arends, a decision maker on plaintiff's adverse employment action, his termination, showed discriminatory animus on plaintiff's gender by mentioning that - plaintiff has "*issues with women, and women in supervisory positions*". Brenda Arends knew about the involvement of a female employee with protected characteristics and knowingly made such discriminatory statements. However, in contrast, several female members of Deloitte, who were not under the influence of Brenda Arends and/or her female colleagues, praised plaintiff's work ethics, demeanor and professionalism. For example, (a) Danica Devito invited the plaintiff to present an information session on Deloitte's behalf at Duke University Management school, (b) Morgan Carlon and Megan Gorges praised plaintiff's work ethics, (c) Lydia Schffield said "*she really enjoyed working with the plaintiff*", (d) Shelly Rescober said "*it was nice working with the plaintiff*", (e) Aditi Shankar and Rushika Patel who thoroughly checked all of plaintiff past project performances and references on February 23rd 2018 said '*it was great to have the plaintiff onboard and they look forward to working with plaintiff*', and (f) Karma Porter, Fanzi Mao Pitzer, Tanya Srivastava said they *really liked working with the plaintiff.* (g) Similar appreciation was given by client Chandra Miranda and Shruti Nayyar.

146. This further shows that Defendant Human Resource Managers singled out the plaintiff, and maintained a discriminatory bias against him on the basis of his gender, knowingly gave him a bad performance rating which denied his promotion, pay rise, and bonus opportunities given to similarly situated employees, deprived him of project opportunities, treated him differently than similarly situated employees, like Youmna and Adrienne, who did not have a sexual harassment allegation against them, and knowingly forestalled his professional and career growth.

## 2.7 Plaintiff Subjected to Different Standards for Project Assignment

147. Similarly, double standards were being maintained by plaintiff's female Resource Manager, Amye Hanes. After learning about plaintiff medical condition / disability, it became apparent that the defendant did not want to assign the plaintiff to any projects. For example, Amye Hanes praised the plaintiff's and his Financial Services skills on one hand, while at the same time, orchestrated a discrimination campaign against the plaintiff by sending him on projects where he had no experience and was destined not to be hired, like delivering data governance training for 40,000+ employees at client Scotia bank. Similarly, In January 2018, after learning about purported sexual harassment allegations against the plaintiff, Amye Hanes denied plaintiff's staffing for the M&A growth accelerator project as mentioned above.

148. Similarly, double standards were being maintained by plaintiff's female Resource Manager, Shanah Setzen, who made sure that the plaintiff did not get staffed on projects where he had the right skills citing 'Position closed, not selected'. Amye Hanes was plaintiff's resource manager in the 2017-18 period, and Shanah Setzen was plaintiff's resource manager in the 2018-19 period. Their supervisory oversight suggests that they had input in the final decision of plaintiff's termination. Thus, it is clear that Defendant as such singled out the plaintiff, discriminated against him on the basis of his medical condition/disability and gender, deprived him of opportunities for which he had the right skillsets, treated him differently than similarly situated employees who did not suffer from allergies and/or did not have a sexual harassment allegation against them, and knowingly forestalled plaintiff's professional and career growth.

149. Each time the plaintiff got released, plaintiff had to struggle to find a new project. Due to his national origin and visa restrictions, before the plaintiff could start working on a new project at a new location, the plaintiff would need to first have his Labor Condition application certified

by the Department of Labor (DOL), a process which would generally take between 7 - 10 business days to complete. After getting his Labor Condition application certified, the plaintiff could only start his work the day after his H-1B visa amendment was filed by the defendant's immigration team, a process that would generally take another week to complete. Thus, the plaintiff would need to wait anywhere between 2-3 weeks before he could start on a new project. During this time, the plaintiff would not be on a billable project, which would hurt his utilization and performance metrics. By releasing the plaintiff from different projects and by not letting him get staffed, the defendant female resource managers, Amye Hanes and Shanah Setzen, intentionally and wantonly worked towards spoiling the plaintiff's utilization and performance metrics.

150. As stated above, after the defendant became aware of malicious sexual harassment allegations, Plaintiff was subjected to different standards of project selection. However, similarly situated employees, like Adrienne Moorefield and Irma Arellano, who did not suffer from life-threatening allergies or disabilities and did not have a malicious sexual harassment allegation against them, were not deprived of project opportunities, were not sent to client project opportunities where they were destined not to be hired, were not staffed on projects which required deep knowledge of an industry which they did not have. Defendant as such singled out the plaintiff, treated him differently than similarly situated female employees who did not have a malicious sexual harassment allegation against them, harassed him, and forestalled his professional and career growth.

151. Female Human Resource Manager, Brenda Arends, and plaintiff's female Counselor, Sai Hampankatta failed to perform proper performance evaluation due diligence for the plaintiff. In addition, Brenda and Sai worked together exclusively to orchestrate a discrimination campaign against the plaintiff, first staffing him on projects in which he had very little to no relevant industry experience, creating a hostile environment on the project for the plaintiff, asking the project leaders to release him from the project and finally publishing to their human resource colleagues that the plaintiff again staffed himself on a project and needs to be released immediately.

152. For example, on Kaiser Permeante project, Senior Manager Tim Van Ee, confessed to the plaintiff that plaintiff's release request came from Sai Hampankatta, who got the instructions

from plaintiff's Talent Manager, Brenda Arends. Defendant as such singled out the plaintiff, discriminated against him on the basis of his gender by maintaining different standards of project selection and performance evaluation, deprived him of opportunities for which he had the right skillsets, treated him differently than similarly situated employees who did not have a sexual harassment allegation against them, and knowingly forestalled plaintiff's professional and career growth.

153. Based on the suspicious timings and the sequence of the events above, one can easily deduce that, female supervisors and employees of the defendant coordinated internally, aided and abetted each other, falsely engineered plaintiff's performance rating, thereby schemed to illegally control the Plaintiff, blocked his customary bonus, pay-raise and/or his promotion to the next level, terminated his employment, constrained his career progression, constrained his civil and constitutional rights, endangered Plaintiff's health, wellbeing, reputation, and harmed Plaintiffs income, and financial resources.

154. Based on the above-mentioned facts, upon information and belief, it is evident that female members of the Deloitte Human Resource department, as mentioned above, have coordinated with project teams internally and falsified plaintiff's performance evaluation report for his Pfizer and Anthem projects. Plaintiff was singled out, treated differently from other employees in this regard, discriminated and retaliated against by the defendant. It is also possible that plaintiff's confidential medical information was leaked to other employees

155. On or about April 6th 2018, male Deloitte Human Resource executive, Austin Perez, coordinated with other female members of Deloitte Human Resource on such issues, showed no interest in the details of the plaintiff's ethics complaint, and instead falsified his own report regarding plaintiff's complaint, by wrongly stating that *"plaintiff would like to rescind his complaint as he no longer feels it necessary"*. After the defendant became aware that plaintiff was assigned a disproportionate workload because of his race, defendant chose not to further investigate plaintiff's ethics complaint. Austin further concealed information and allegations from the plaintiff on his ethics complaint investigation. Plaintiff was singled out, treated differently from similarly situated employees who did not have a malicious sexual harassment complaint or were

not discriminated against due to the existence of a female professional with protected characteristics

## Discrimination by Apple based on Plaintiff's Gender

156. Apple Recruiter knew about plaintiff's gender discrimination allegations against Deloitte Consulting LLP. On or about February 4th 2020, the plaintiff specifically notified the Apple Recruiter, Caitie Wojdak, about his pending federal employment lawsuit against Deloitte and about his gender discrimination allegations over the phone, and on February 6th 2020 over the email.

157. Upon information and belief, similarly situated recruitment candidates who did not suffer from gender-based employment discrimination on the basis of a malicious sexual harassment allegation at their previous employers, or on the basis of protected characteristics of a pregnant female supervisor by their previous employer, were considered for the full-time positions at Apple. These recruitment candidates or applicants went through Apple's recruitment process and were subsequently hired as full-time employees by Apple. Similarly situated applicants were neither discriminated nor retaliated by the Apple Recruiter on the basis of their gender.

158. For the years 2019-2020, Plaintiff and a similarly situated to Apple female applicants, Kristen Bautzmann and Alicia Faustyn. Both plaintiff, Kristen and Alicia had almost the same number of years of work experience. Both applicants were subjected to similar hiring standards, that screened for and required similar skill, effort, and responsibility for the similar New Product Introduction Program Manager position at Apple. Both applicants had a Bachelor's degree, however, the plaintiff had a Master's degree in addition to the Bachelor's degree.

159. For the years 2019-2020, Kristen and Alicia were hired as a New Product Introduction Program Manager by Apple, however, the plaintiff was not. Upon knowledge and belief, Kristen and Alicia did not suffer from a malicious sexual harassment allegation at their previous employers, were not discriminated by their previous employers on the basis of protected characteristics of a pregnant female supervisor. Plaintiff had the additional experience of representing himself on an employment discrimination lawsuit in both State & Federal Court, however, upon knowledge

and belief, applicants Kristen and Alicia lacked the plaintiff's experience with courts. Kristen and Alicia also lacked plaintiff's diverse work experience dealing with multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

160. Apple singled out the plaintiff and treated the Plaintiff differently than similarly situated female applicants, Kristen and Alicia, applicants who did not suffer from gender discrimination in the form of sexual harassment allegation or protected female factor like pregnancy. Kristen and Alicia were finally hired by Apple as a fulltime employee while the plaintiff was not. At Deloitte, the plaintiff was not just confidentially accused of any harassment, the plaintiff was accused of sexual harassment which provide the minimal inference of sex bias.

161. Defendant Deloitte substantial procedural irregularities in the investigation of the sexual harassment allegation, including their failure (a) to seek out potential witnesses that the accuser Christina Young had identified as sources of information, (b) accuser Christina's inconsistent statements on the facts, (c) Deloitte's failure to comprehend the causal connection and malicious nexus between the December Holiday Party and the false sexual harassment allegation raised by Christina on January 11th for the January 10th 2018 event, (d) Deloitte's failure to act in accordance with company procedures designed to protect accused employees, and (e) Deloitte's arrival at conclusions such as the plaintiff was inebriated at multiple events without any fact checking or witness testimony – such actions were "incorrect and contrary to the weight of the evidence".

162. The procedural deficiencies in the Deloitte's investigation and adjudication of the sexual harassment complaint raise an inference that the Deloitte was motivated, at least in part, by sex bias. It is plausible that Deloitte was motivated to "favor the accusing female over the accused male" in order to demonstrate its commitment to protecting female employees from male sexual assailants. Upon knowledge and belief, after learning about plaintiff's job application at Apple, Defendant Deloitte HR communicated with Apple HR and exerted their influence such that plaintiff would not be able to secure gainful alternate employment at Apple.

163. Moreover, after the Plaintiff's February 7th 2020 phone call to the Apple Recruiter Caitie Wojdak, the abrupt change of direction on plaintiff's recruitment process, followed by cessation

of communication by defendant Apple suggests that Apple's decision on the issue was motivated, at least in part, by bias. Since the issue was not just a harassment issue, but a sexual harassment issue, Apple's decision was motivated by sex bias. It is plausible that Apple refused to hire the plaintiff because it was motivated to "favor non-accused female applicants and employees at Apple over the accused male plaintiff" in order to demonstrate its commitment to protecting female applicants and employees from male sexual harassers.

164. After learning about Plaintiff's malicious sexual harassment allegation, defendant Deloitte consulting took multiple adverse actions against plaintiff, such as issuing him a malicious letter of reprimand, replacing him on a project with a White US national, Deloitte treated similarly situated employees differently than the plaintiff and terminated his employment. The clearly irregular investigative or adjudicative process, lack of information on the subject to the plaintiff, lack of communication on the issue to the plaintiff, followed by a constant drumbeat of ridicule, mocking and harassment both on and off projects provide an inference that Deloitte was motivated by sex-based bias.

165. The evidence substantially favored the plaintiff, but the Deloitte evaluator, Joanna Rohde, a Caucasian female, without an apparent reason based on the evidence, formed an opinion and/or a conclusion in favor of the female accuser. Thus, this further provides an inference that the evaluator has been influenced by gender bias.

166. The defendant Deloitte became aware of plaintiff's disability in December 2017, as informed by the plaintiff to the Deloitte Partner. In early January 2018, Christina filed her malicious acquisitions, and other female supervisors gave the plaintiff a negative performance rating in February 2018. The internal involvement of female Deloitte Human Resource (HR) Managers and their continued communication with plaintiff's female supervisors within this period suggest that defendant Deloitte Consulting formed an opinion or a conclusion – in favor of the female accuser and in-general to protect the interest of other females – and against the plaintiff. Thus, this further provides an inference that the female HR professionals and the plaintiff's female supervisors had been influenced by gender bias.

167. The defendant Deloitte has further concealed information on the protected characteristics or factor of plaintiff's female supervisors. Upon knowledge and belief, one of the female

supervisors involved in plaintiff's case was pregnant. After the defendant formed an opinion and/or a conclusion in favor of the female sexual harassment accuser, and after the defendant discovered the existence of a female supervisor who was responsible to either provide or help identify a performance evaluation for the plaintiff, the defendant Deloitte knowingly and wantonly made sure that the plaintiff was assigned a false non-discriminatory reason for separation.

168. After learning about plaintiff's sexual harassment allegation in mid-January 2018, the defendant Deloitte decided to assign the plaintiff a non-discriminatory performance-based negative evaluation to maintain an illegal control of the plaintiff, and further concealed information from the plaintiff to limit their liability. Female HR professions and supervisors communicated about the plaintiff and his work performance, and the plaintiff was assigned a negative performance evaluation.

169. On February 16th 2018, the defendant Deloitte issued a discriminatory, biased, false and malicious letter of reprimand to the plaintiff. After the plaintiff refuted the letter and provided witnesses to support his innocence, the defendant concocted a malicious plan to permanently assign a non-discriminatory performance-based reason for plaintiff's termination. The plaintiff was rolled off projects and was sent to projects for which he was not trained for. Deloitte failed to train the plaintiff for positions on the basis of his race, and Deloitte's past negative treatment of the plaintiff on the basis of his race is relevant in showing that Deloitte's proffered reasons for an adverse action against the plaintiff were not true.

170. On February 16th 2018, the plaintiff provided evidence and witnesses that identified that plaintiff was sober and well behaved on the January 10th 2020 event. After the defendant Deloitte became aware of this fact, the defendant knew that the malicious acquisition filed by Christina Young was false. This provided the defendant a further impetus to conceal material facts on the issue, and knowingly and wantonly provide the plaintiff with a permanent negative performance evaluation.

171. After the plaintiff produced witnesses, the defendant Deloitte employee Joanna Rohde knew that on January 11th 2018, Christina Young had made false allegations against the plaintiff for the January 10th 2018 event. Since Joanna coordinated internally to have the plaintiff released from

the JP Morgan Chase project on December 18th 2021 (as identified previously), and because she created a false and malicious letter of reprimand, in order to save herself, the firm and the financial services partners from liability, she had no option but to corroborate with Christina Young. Both Christina and Joanna helped each other by having Christina provide inconsistent statements on the sexual harassment issue, and later Christina was moved as Chief of Staff to a Litigating firm upon knowledge & belief around the same time plaintiff filed his lawsuit in court.

172. Defendant Joanna Rohde acted in this manner in order to conceal defendant's direct involvement on the issues such as (a) FSI Partner's direct knowledge of plaintiff's disability / medical condition in Dec. 2017, (b) Joanna's involvement on plaintiff's release from the J.P Morgan Project the next business day of plaintiff's disability event, and (c) defendant's discrimination against the plaintiff on the basis of protected characteristics / factors of other female employees in 2018 specifically because of the existence of a pregnant woman. HR Joanna Rohde was aware of the situation and actively participated in retaliatory acts against the plaintiff such as the issuance of a malicious letter of reprimand, and plaintiff's release from the JP Morgan Chase and Fox News Projects.

173. In Early 2020, the plaintiff clearly explained his position on the employment lawsuit, and provided the required information to the Apple recruiter. The allegations substantially favored the plaintiff, but the Apple evaluator, Caitie Wojdak, a Caucasian female, without an apparent reason based on the evidence, formed an opinion and/or a conclusion in favor of the female accuser and female employees at Apple. Thus, furthering providing an inference that the evaluator Ms. Wojdak had been influenced by gender bias.

174. The plaintiff applied to the several positions at Apple, and the plaintiff's profile was selected by the Apple recruiter. The plaintiff was qualified for the position at all times. However, the Apple recruiter, Caitie Wojdak, a Caucasian female, further showed bias by providing better treatment to white female recruitment applicants, like Kristen Bautzmann and Alicia Faustyn, who were subsequently hired by Apple. While plaintiff, a non-White Asian male applicant, was rejected by Apple and his application was denied.

175. The plaintiff applied to the several positions at Apple, and the plaintiff's profile was selected by the Apple recruiter. The plaintiff was qualified for the position at all times. However, the Apple

recruiter, Caitie Wojdak, a Caucasian female, further showed bias by continuing to seek applications for the multiple positions, including the data NPI Program Manager position. Apple subsequently hired Kristen Bautzmann in March 2020 and Alicia Faustyn in September 2020. Upon knowledge and belief, other female candidates were continued to be hired for the same Program Manager position at Apple Product Operations group after the plaintiff's application was denied.

176. Apple Recruiter knew about plaintiff's race and national origin discrimination allegations against Deloitte Consulting LLP. On or about February 4th 2020, the plaintiff specifically notified the Apple Recruiter, Caitie Wojdak, about his pending federal employment lawsuit against Deloitte and about his race and national origin discrimination allegations against Deloitte over the phone, and on February 6th 2020 over the email.

177. For the years 2019-2021, Plaintiff and a similarly situated to Apple White female employees, Elizabeth Robertson and Clararose Voigt. Both plaintiff, Elizabeth and Clararose had almost the same number of years of work experience. Elizabeth and Clararose worked on similar positions that required similar skill, effort, and job responsibilities at Apple, which is comparable to plaintiff's Client Consulting work at Deloitte. Elizabeth and Clararose were subject to the same standards of fulltime employment discrimination laws at Apple, as the plaintiff at Deloitte. These employees had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

178. For the years 2019-2021, Elizabeth Robertson and Clararose Voigt were internally promoted by Apple for similar positions that the plaintiff applied to, however, the plaintiff was not hired. Upon knowledge and belief, Kristen and Alicia did not suffer from a malicious sexual harassment allegation at Apple, were not discriminated by Apple on the basis of protected characteristics of a pregnant female supervisor or their race. Plaintiff had the additional experience of representing himself on an employment discrimination lawsuit in both State & Federal Court, however, upon knowledge and belief, applicants Kristen and Alicia lacked the plaintiff's experience with courts. Elizabeth Robertson and Clararose Voigt also lacked plaintiff's diverse work experience dealing with several multiple clients in different business

industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

179. Apple singled out the plaintiff and treated the Plaintiff differently than similarly situated White female employees, Elizabeth Robertson, Clararose Voigt, who did not suffer from gender discrimination by their previous employer or by Apple in the form of sexual harassment allegation or protected female factor like pregnancy, or were not discriminated at Apple based on their race. Elizabeth Robertson and Clararose Voigt, full-time Apple employees who were outside of plaintiff's protected gender and race class, were internally promoted by Apple for similar positions that the plaintiff was not hired for.

180. Apple singled out the plaintiff and treated the Plaintiff differently than similarly situated White female applicants who were later hired as fulltime employees, Kristen Bautzmann and Alicia Faustyn. These employees did not suffer from gender discrimination by their previous employer or by Apple in the form of sexual harassment allegation or protected female factor like pregnancy, or were not discriminated at Apple based on their race. Kristen and Alicia were outside of plaintiff's protected gender and race class, were hired by Apple while the plaintiff was not hired.

### III.   Retaliation

### Retaliation by Deloitte

181. In Sept. – Nov. 2017, on the Anthem project, based out of Los Angeles, Plaintiff was given the task to replace an employee with 8+ years of work experience in a subject area, and manage her functional workstream which had heavy workload, including hundreds of documented open items, a subject area where the plaintiff had no experience at all. Plaintiff was assigned this specific part of a larger IT data migration project work because the mentioned employee was leaving. Plaintiff had no formal training and/or no experience in the subject area – primitive mainframe system data modeling and migration in healthcare insurance industry vertical.

182. Just as the plaintiff tried to discuss the situation with the leadership, he was given additional responsibility by his project supervisors with discriminatory intent. This additional responsibility

was to manage another technical workstream with equivalently heavy workload, held by another employee with 20+ years of experience in the subject area and industry. Plaintiff was required to travel every week from New York to Los Angeles for the project.

183. When plaintiff raised concerns about the enormity of work and complexity of task with his supervisors, he was told by his project supervisor, Senior Manager - Ashley Scorsatto that "*being an Indian, he should be able to handle the situation*", "*he should be able to handle the additional workload*", thus plaintiff was reminded of his temporary visa status in the United States, and was threated to take on extra workload based on his national origin and race as identified by plaintiff in his ethics complaint made in February 2018. Thus, plaintiff was singled out against other US and foreign nationals working for the same supervisor and the same client, who were not assigned workload of two fulltime employees and were not made disparaging comments.

184. Similarly, at another instance, given the enormity of the work, the complexity of the task, and tight timelines, when plaintiff raised concerns that he is required to work more than twice as hard because of the workload and because he did not possess expertise in the subject area, and that the project was not being managed properly, plaintiff was threatened against raising such issues. Plaintiff was told that that "*raising such issues would have consequences*" and "*failure is not an option*" thus plaintiff was intimidated and threatened with termination on failure to complete the disproportionately heavily workload. Plaintiff was also denied additional training opportunity given the tight project timeline. Plaintiff later learned from others that it may result in deliberate poor performance evaluation by his supervisors.

185. However, in spite of these issues, the plaintiff worked extremely hard and coordinated with client, onsite and offshore teams, and technology vendor to ensure timely delivery on almost all of the functional issues. Plaintiff also carefully streamlined all technology tasks for the current and next phase of project release. The defendant as such singled out the plaintiff, treated him differently than similarly situated employees, like Rishil Murukan, who had significant experience in the specific subject area, and upon information & belief were given good performance rating, were not threatened with adverse consequences of raising project mismanagement issues and were not discriminated based on their race or national origin.

186. On or around November 8th 2020, plaintiff's project supervisors released the plaintiff from the project citing budget issues. They mentioned the project was running low on budget and travelling from New York to Los Angeles was expensive. Another consultant working with the plaintiff on the same team was also released on the same day citing budget restrictions. Plaintiff was to transition his work in a week to a female employee, Swatika Gupta. The team was scheduled to meet next week in Atlanta, GA. Thus, plaintiff's project supervisor Ashley Scorsatto's bias against the plaintiff, a male employee, was further evident by this replacement. The defendant as such singled out the plaintiff, treated him differently than similarly situated employees, like Swatika Gupta, who had significant experience in the specific subject area, were given good performance rating and were treated more favorably by the project supervisor due to her race.

187. For the years 2016-2018, Plaintiff and a similarly situated employee, Swatika Gupta, female Senior Consultant, Deloitte Strategy and Analytics, performed similar work consisting of the same or similar duties including, but not limited to advising clients, leading and/or contributing to client work or projects, building firm eminence, contributing to internal firm initiatives and client proposals, collaborating with and/or mentoring junior staff, etc. They both were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment. Swatika did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation filed against her.

188. Plaintiff had good working relationship with his teammates. Next week in Atlanta, GA, on 15th of November 2017, the entire team gave the plaintiff and the consultant a project release party based on plaintiff's efforts and good work. Party was named - Plaintiff and Consultant's release party (names redacted). Upon information and belief, the party was attended by 10+ employees. Plaintiff could not attend his release party as he had to change hotels that day and was suffering from allergies. Since plaintiff had allergies at his previous hotel room at J.W Marriot, he moved to the Westin on 15th November. Plaintiff again met with his teammates reminiscing the project at a Deloitte University event in February 2018.

189. In January 2018, after the defendant became aware of plaintiff's medical condition / disability and malicious sexual harassment allegations against him, Deloitte Talent Relations HR Joanna

Rohde and Performance Management HR Katie Wittenbraker, who knew about the malicious sexual harassment allegations against the plaintiff, coordinated internally with plaintiff's counselor and plaintiff's female project manager for the Anthem project to falsify plaintiff's performance rating. The project manager followed suit, in part to hide her own discriminatory practices on the project, and in part to save the firm from any legal liability on the malicious sexual harassment complaint. For example, Katie Wittenbraker stated in her notes that plaintiff has issues working with female leaders which is incorrect

190. In February 2018, after completing firm wide training, plaintiff filed an ethics violation report citing discrimination and workplace misconduct in the matter. Hence, plaintiff participated in a protected activity by (a) filing an Ethics, Integrity and Personal Conduct violation report, (b) identifying discrimination such as assignment of disproportionately heavy workload, and (c) identifying invidious actions and comments made by his supervisors. Plaintiff was treated differently - that is, plaintiff suffered retaliation - on the basis of his participation in discrimination investigation and/or proceeding. This participation constituted an "impermissible" reason to treat an employee differently.

191. However, instead of completely investigating plaintiff's complaint, taking disciplinary action against plaintiff's supervisors, and giving the plaintiff a good performance rating, the defendant further maintained a discriminatory and retaliatory bias against the plaintiff (a) by assigning him negative performance review for his Anthem Project, (b) by not informing the plaintiff about the outcome of the investigation, (c) by not interviewing the witnesses identified by the plaintiff on this ethics complaint, (d) by not informing the plaintiff about the details of the ethics complaint investigation, or any other complaint, for example, the sexual harassment complaint against the plaintiff

192. The defendant further discriminated and retaliated against the plaintiff by (a) inaccurately paraphrasing plaintiff's account of events, (b) inaccurately claiming that plaintiff wanted to rescind his ethics complaint, (c) not asking the accused questions on the issues raised by the plaintiff on his ethics complaint, and (d) not informing the plaintiff his potential right to have an employee advocate who can positively represent him within the firm. These actions by the defendant occurred after defendant became aware of plaintiff's disability / medical condition, malicious sexual harassment allegation based on gender, and his workplace discrimination /

ethics violation complaint. Upon information & belief, plaintiff was singled out against similarly situated employees who did not suffer from life threatening allergies, did not have a sexual harassment allegation against them and did not file a workplace discrimination complaint based on disproportionately heavy workload, and disparaging comments by their supervisors.

193. Ashley Scorsatto and Binu Janardhanan were plaintiff's supervisor on this Anthem project. They gave the plaintiff a bad performance rating on the project. The rating was submitted on the defendant system in early February 2018 after the plaintiff completed his ethics training, and plaintiff was made aware of it in June 2018. Their supervisory oversight suggests that they had input in the final decision of plaintiff's termination. Plaintiff further believes that above mentioned retaliatory moves and statements were made by the defendant as retaliation to his filing of an ethics complaint and to further discriminate against the plaintiff based on his disability / medical condition. The defendant knew that the plaintiff could claim disability, racial discrimination and retaliation on this specific issue.

194. Plaintiff filed the ethics complaint in February of 2018, right after taking the ethics and integrity training and right after his supervisors filed his performance rating on the system, and the defendant deliberately waited until June 2018 to inform the plaintiff of the negative performance rating on the project. Plaintiff was terminated 4 months later in early November 2018. The causal connection between the act of discrimination, followed by plaintiff's engagement in the protected activity – that is his ethics and workplace conduct violation report, followed by multiple instances of discriminatory treatment adverse employment actions from February to October 2018, followed by plaintiff's termination in November 2018 – the timing, sequence and connection of activities show defendant's retaliatory motive.

195. Had the defendant given the plaintiff good and unbiased performance review, plaintiff would not have received a negative performance rating for the 2017-18 cycle, since this project constituted for 11 or more weeks of client billable work which in turn-constituted of little more than 33% of plaintiff's billable work for the 2017-18 performance cycle. Good performance review on this project would have added to the great performance rating plaintiff received on the other Citibank project during the same performance cycle. This in turn would have allowed the plaintiff to receive his material annual performance incentive benefits like compensation

increase, bonus and/or promotion, during Aug. end / early Sept. 2018, and would not have led to plaintiff's non-discriminatory performance based his termination. Ashley and Binu's discriminatory behavior combined with negative performance rating constitute adverse employment action. The defendant as such singled out the plaintiff, treated him differently than similarly situated employees, like Youmna Saloumi, Rishil Murukan, who did not have a medical condition / disability, did not have a malicious sexual harassment allegation against them or were not discriminated on the basis of gender based protected factors, and were not discriminated against on the basis of their national origin or race.

196. On or about April 6th 2018, Deloitte Human Resource executive, Austin Perez, coordinated with other female members of Deloitte Human Resource on this issue, showed no interest in the details of the plaintiff's complaint, and instead falsified his own report regarding plaintiff's complaint, by wrongly stating that *"plaintiff would like to rescind his complaint as he no longer feels it necessary"*. After the defendant became aware that plaintiff was assigned a disproportionate workload because of his race, defendant chose not to further investigate plaintiff's ethics complaint. Austin further concealed information and allegations from the plaintiff on his ethics complaint investigation. Plaintiff was singled out, treated differently from similarly situated employees who did not have a malicious sexual harassment complaint or charge against them

197. In February 2018, plaintiff filed an ethics and workplace conduct violation complaint. However, HR showed no interest in plaintiff's ethics complaint and instead retaliated against the plaintiff and accused the plaintiff of being inebriated on two (2) different occasions, and to sign a letter of reprimand admitting that he was inebriated on two (2) separate events on two (2) different dates otherwise his employment would be terminated. However, plaintiff did not sign the letter and instead produced multiple witness to confirm that he was sober and of his underlying medical condition.

198. By informing Deloitte business leaders and Senior Human Resource professionals about his medical condition, plaintiff stood up for his rights and engaged in a protected activity. Defendant Partner and HR asked the plaintiff to sign a letter of reprimand and threatened plaintiff with

termination. However, plaintiff provided witnesses for his innocence. Thus, Plaintiff engaged in a Protected Activity.

199. In addition, plaintiff opposed discriminatory practices and stood up against violations of law, that is engaged in protected activity, by objecting to defendant's discriminatory practices during scheduled calls with Human Resource managers such as (a) call with Partner and HR on Feb 16th 2020 on defendant's malicious letter of reprimand, (b) call with HR Joanna Rohde on Feb 16th and March 6th 2020 on letter of reprimand and defendant's releasing the plaintiff from JP Morgan Chase, M&A project and 21st Century Fox project, and (c) calls with HR on defendant's investigation on plaintiff's ethics complaint. Defendant's motivation and malicious intent in these areas is evident from their malicious letter of reprimand, from plaintiff's release from projects etc.

200. After the malicious letter of reprimand, the firm knew that they have retaliated against the plaintiff, and he may potentially file a discrimination complaint. The firm then falsely engineered a non-discriminatory performance-based reason to illegally control the plaintiff, and knowingly gave him a poor performance rating. In addition, the firm did not pay any bonus to the plaintiff for his hard work. Thus, Plaintiff was singled out, and treated differently than similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, Irma Arellano, who did not suffer from life-threatening allergies, who did not have a malicious sexual harassment allegation against them, and were not given a malicious letter of reprimand and threatened with termination

201. After learning about plaintiff's disability / medical condition in December 2017, and malicious sexual harassment allegations against the plaintiff in January 2018, defendant female Resource Managers (RM) Amye Hanes and Shanah Setzen, both women of Caucasian ethnicity, maintained discriminatory bias against the plaintiff, released the plaintiff from projects and closed his project role submissions requests on the internal job portal by citing - 'Position Closed, Not selected' (id at 39). Plaintiff's female Supervisors and Human Resource Managers – Ashley, Christina, Joanna, Brenda, Katie, Amye, and Shanah – maintained a discriminatory bias against the plaintiff, for example, on her investigatory call between HR Katie Tiller Whittenbraker and Ashley Scorsatto, Katie notes that plaintiff has issues working with female leaders, which is incorrect as plaintiff has recommendation from several women colleagues and leaders at Deloitte (id at 44 to 48)

202. Defendant knew that it had discriminated and retaliated against the plaintiff several times before, and plaintiff could make a claim against the defendant. Hence, the defendant planned to make it more difficult for the plaintiff to prove good results in spite of his great efforts by assigning plaintiff projects that were outside his core industry expertise and skillset. Defendant knew that diverse assignments in multiple industries, at different clients distributed among multiple states within United States, combined with a negative performance evaluation, would deter or dissuade a reasonable worker like the plaintiff from making or supporting a charge of discrimination. By excluding plaintiff from projects that contributed significantly to his professional advancement, might well deter a reasonable employee, like the plaintiff, from complaining about discrimination.

203. After the December 14th 2017 event, Plaintiff's project assignments at clients 21st Century Fox, TJX Industries, Ball Corporation and Kaiser Permanente were outside of his core expertise and skillset. As these projects needed additional work in terms of (a) learning a new subject area, at a new client for a new / unique business, (b) preparation for advising internal team and clients and (c) execution both in terms contributing to and delivering client work, Plaintiff had to work twice as hard on such projects to achieve the same results as employees with significant experience in the subject area; and this pattern of work assignment thus constituted a disproportionally heavy work for the plaintiff. Thus, plaintiff was treated differently than similarly situated male and female US and foreign based employees, like Youmna, Morgann and Todd, who did not suffer from life-threatening allergies or disabilities.

204. As mentioned previously, plaintiff's claims for retaliation, and discrimination based on his disability, gender, national origin and race are intertwined. Plaintiff was hired for his experience, expertise and skillset in Life Sciences (Pharma) and Finance. Plaintiff received good performance rating for his projects at Citibank (Finance) and Bausch Health (Life Sciences). Plaintiff further received good performance rating for his firm eminence work in Life Sciences. However, after plaintiff's disability incident in 2017, the above-mentioned project assignments, outside of plaintiff's core industry experience and expertise, combined with multiple project removals and change in project responsibilities were so significant as to constitute a setback in plaintiff's career. In spite of these challenges, the plaintiff managed to secure praise and recommendations from Deloitte client and internally from Deloitte leaders.

205. In a durable pattern of discriminatory bias against the plaintiff, defendant deliberately placed the plaintiff on diverse short-term projects that were outside of his core expertise to hide its own (a) discriminatory practices at the Anthem and TJX projects, (b) their discriminatory role in the malicious sexual harassment allegation, (c) their malicious letter of reprimand, (d) their release of plaintiff from different projects, (e) their falsely engineered non-discriminatory reason for plaintiff's termination based on performance. However, plaintiff worked twice as hard on these projects and was intermittently commended by his Deloitte and Client leaders.

206. Defendant was motivated to discriminate against the plaintiff. Defendant criticized plaintiff's performance in ethnically degrading terms, replaced plaintiff on projects with employees outside his protected class, and provided more favorable treatment to employees not in the protected group. Defendant knew that it had discriminated against the plaintiff at several instances, and plaintiff may file a charge of discrimination. Thus, to avoid liability on any potential charge of discrimination, defendant gave a plaintiff negative performance rating in spite of his good work and effort, and thus, falsely engineered a false non-discriminatory reason for plaintiff's termination.

207. Further, the sequence and timing of the events suggest that defendant maintained discriminatory bias against the plaintiff based on his gender. After learning about the malicious sexual harassment allegation in January 2018, defendant (a) architected a malicious letter of reprimand against the plaintiff, (b) did not follow the defendant's own processes and protocols of informing or interviewing the plaintiff on the malicious sexual harassment allegation, (c) concealed the sexual harassment complaint, identity of the accuser, Christina Young, and information about her retaliation history at JP Morgan Chase, (d) treated Christina Young's more favorably by not investigating her malicious allegations, and (e) intentionally released the plaintiff from projects before completion.

208. Plaintiff's business unit and defendant talent relations group thereafter created a policy or custom under which discriminatory bias against the plaintiff occurred. For example, plaintiff was intentionally given a negative performance rating on his projects, thus defendant engineered a false and non-discriminatory reason for plaintiff's termination. Similarly, plaintiff's supervisors maintained a discriminatory bias against him, and plaintiff was mocked or harassed on each and

every project while similarly situated employees were not. These incidents were more than episodic; they were sufficiently concerted and continuous to be deemed pervasive.

209. Defendant's pervasive discriminatory bias, be it (a) Plaintiff's performance being criticized in ethnically degrading terms, (b) defendant replacing plaintiff on projects with employees outside his protected class, (c) defendant providing more favorable treatment to employees not in the protected group, (d) invidious comments being made by plaintiff's supervisors, and (e) the sequence and timing of events leading up to plaintiff's discharge, indicate that plaintiff's termination occurred under circumstances giving rise to an inference of discrimination on the basis of intertwined factors based on plaintiff's disability, gender and national origin and race.

210. Further, as mentioned in this complaint, plaintiff's HR supervisor Brenda Arends actively participated in plaintiff's release from projects, engineered his negative performance evaluation and his eventual discriminatory termination. Further, Joanna Rohde actively supported her colleagues, acted under the color of law, knowingly concealed information from plaintiff, was informed and aware but failed to take appropriate action with respect to malicious sexual harassment complaint directed at plaintiff. These human resource professionals maintained a discriminatory bias against the plaintiff based on his disability, gender, national origin and race.

211. The discriminatory practices of these senior policy making officials were so persistent or widespread as to constitute a custom or usage under law. The defendant was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff.

212. Thus, plaintiff's termination would not have occurred in the absence of the above-mentioned retaliatory motives. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred. Plaintiff possessed a good faith and objectively reasonable belief that the employment practice at issue was unlawful under the relevant statutes. On each of the above instances, the employer was put on notice for their illegal conduct, be it assignment of disproportionately heavy workload, invidious actions or comments by supervisors, plaintiff's disability / medical condition being the reason of his unconsciousness, malicious letter of reprimand, incomplete ethics violation investigation, or discriminatory bias on projects. However, on each of the circumstances,

defendant acted knowingly and intentionally against the plaintiff and his civil and constitutional rights.

213. Based on the events mentioned above, it is clear that the regulatory body within Deloitte, Talent Relations, led by Joanna Rohde, which advocates slogans like "Integrity is everything", actively collaborated with the Business. By not properly investigating any of plaintiff's ethics and performance concerns on the Anthem project, and personnel issues like the malicious sexual harassment case, it helped other members of the Human resources intentionally sabotage plaintiff's performance rating and personnel file. Defendant as such singled out the plaintiff, treated him differently than similarly situated employees like Youmna Saloumi and Adrienne Moorefield, retaliated against him for defending himself with proof of his medical condition, retaliated against him for filing an ethics and integrity violation on disproportionately heavy workload, and retaliated and discrimination against him based on a malicious sexual harassment allegation and based on his national origin and race, harassed him, and forestalled his professional and career growth.

## **Retaliation by Apple**

214. By filing an employment lawsuit against Deloitte, the plaintiff engaged in a protected activity.

215. Apple Recruiter Caitie Wojdak knew that the plaintiff was retaliated against by his previous employer Deloitte Consulting LLP. She knew about plaintiff's pending employment lawsuit pending at the Southern District of New York. Defendant Apple refused to hire the plaintiff, and such refusal constituted an adverse employment action.

216. The Apple recruiter told the plaintiff that she was extremely interested in plaintiff's profile and is considering the plaintiff for multiple positions within the product operations group. Had the plaintiff not mentioned about his pending employment lawsuit and the retaliation claims to the Apple Recruiter, the defendant Apple or the Apple Recruiter Caitie Wojdak would have given the plaintiff an opportunity to further continue with the recruiting process. The plaintiff's recruitment at Apple would not have been delayed and then denied.

217. The Apple recruiter told the plaintiff that she was extremely interested in plaintiff's profile, however, she delayed and denied plaintiff's recruitment process after learning about plaintiff's pending employment lawsuit. It is plaintiff's belief that had Apple allowed the plaintiff to continue through the interview process, the plaintiff would not have received a refusal to hire from Apple, and would have secured a full-time position with Apple. And even if Apple were to refuse to hire the plaintiff, Apple would have provided a legitimate reason for its action.

218. Defendant Apple overlooked plaintiff's key skillsets like having experience with diverse clients in multiple industries, having experience with courts etc. Defendant Apple hired candidates who were less qualified than the plaintiff as they did not possess these skillsets. Defendant Apple retaliated against the plaintiff by not hiring the plaintiff. Defendant Apple hired employees who were outside of plaintiff's protected class.

219. The defendant Apple as such singled out the plaintiff, treated him differently than similarly situated employees, like Jenna Kovalsky, Kristen Bautzmann and Alicia Faustyn, who (a) did not have a pending employment lawsuit against them by their previous employer, who (b) did not suffer from serious allergy based medical condition / disability, who (c) were not discriminated by their previous employer or by Apple on the basis of protected characteristics or factors of female employees, who (d) were not discriminated on the basis of a malicious sexual harassment allegation against them, and (e) were not discriminated on the basis of their national origin or race. These employees were not retaliated by Apple and went through the recruitment process and got hired.

220. For the years 2019-2021, the Plaintiff was similarly situated to Apple applicants Giridhar Balasubramanian and Jitendra Bambhroliya. Upon knowledge and belief, these applicants were eligible to work for Apple on the basis of their specialty worker H1B visa, same as the plaintiff. These applicants also had similar nationality as the plaintiff and were Indian Nationals. These employees had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

221. Plaintiff had the additional experience of representing himself on an employment discrimination lawsuit in both State & Federal Court, however, upon knowledge and belief, applicants Giridhar

Balasubramanian and Jitendra Bambhroliya lacked the plaintiff's experience with courts. Applicants Giridhar and Jitendra also lacked plaintiff's diverse work experience dealing with multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

222. Plaintiff's previous employer Deloitte Consulting discriminated and retaliated against the plaintiff as identified on plaintiff's employment lawsuit and as mentioned to the Apple Recruiter Caitie, Deloitte assigned the plaintiff disproportionately heavy workload of two full-time employees, and violated plaintiff's anti-discriminatory practices of the specialty worker Labor Condition Applications (LCA) governed by the Department of Labor (DOL). Thus, plaintiff was a member of a protected class.

223. Apple singled out the plaintiff and treated the Plaintiff differently than similarly situated foreign national employees, Giridhar Balasubramanian and Jitendra Bambhroliya. Upon knowledge and belief, the previous employers of these Apple Applicants Giridhar Balasubramanian and Jitendra Bambhroliya did not violate the anti-discriminatory practices of the specialty worker Labor Condition Applications (LCA) governed by the Department of Labor (DOL). These Apple applicants were outside of plaintiff's protected class based on DOL LCA violations, were hired by Apple for Fulltime roles in 2019 and 2020, while the plaintiff was not hired.

## IV.   Discrimination Based on National Origin & Race

## Discrimination by Deloitte based on Plaintiff's National Origin & Race

224. The defendant created a workplace atmosphere that was permeated with discriminatory intimidation, and steadily intensifying drumbeats of insult and ridicule that were sufficiently severe or pervasive to alter the conditions of plaintiff's employment with the defendant. As explained, the Defendant purposefully and intentionally created work environment filled with insult and ridicule (a) by threatening the plaintiff with "termination and deportation", (b) by deliberately releasing him from projects in spite of his good performance, (c) by calling him "deplorable" and "expendable Indian", (d) by giving him a bad performance rating, (e) by

limiting his project opportunities, (f) by limiting his training opportunities, (g) by making him wait for weeks to start a new assignment based on his visa limitation, and (h) finally by wrongfully terminating his employment. The timing and sequence of events leading to plaintiff's termination suggest that plaintiff was discriminated on the basis of his national origin and race.

225. In October 2017, on the Anthem project, Plaintiff was given disproportionately heavy workload because of his race. He was given the task to replace an employee with 8+ years of work experience in a subject area, and manage her functional workstream which had heavy workload where the plaintiff had no experience at all. Just as the plaintiff tried to discuss the situation with the leadership, he was given additional responsibility by his project supervisors with discriminatory intent. This additional responsibility was to manage another technical workstream with equivalent heavy workload, held by another employee with 20+ years of experience in the subject area. When plaintiff raised concerns with his supervisors, he was told by Ashley Scorsatto that *"being an Indian, he should be able to handle the situation"*, *"he should be able to handle the additional workload",* thus plaintiff was reminded of his temporary visa status in the United States, and was threatened and forced to take on extra workload based on his national origin and race. The defendant as such singled out the plaintiff, treated him differently than similarly situated employees like Todd Patman, Rishil Murukan, who had significant experience in the specific subject area, and who were not discriminated based on their national origin and/or race, and forestalled his professional and career growth.

226. In December 2017, Deloitte Partner Michael Fernandez, Chief People Officer, Deloitte US Financial Services, a person of White American ethnicity, noticed the plaintiff unconscious and instead of taking him to a hospital, took him to a hotel room. The partner also witnessed the plaintiff vomit several times. The next day, after learning about the plaintiff medical condition, Caucasian defendant employees retaliated against the terms, conditions or privileges of his employment and initiated an unlawful discriminatory bias based on plaintiff's temporary disability and ethnicity by releasing him from the J.P Morgan project which was scheduled to start in the UK. Plaintiff was singled out and treated differently than similarly situated employees like Youmna Saloumi, a female Sr. Consultant of Middle Eastern ethnicity, and Adrienne Moorefield, a female Sr. Consultant of Caucasian ethnicity, who did not face removal from project based on disability and race.

227. Plaintiff was assigned disproportionately heavier workload than similarly situated employees. Upon information and belief, similarly situated US based white employees with similar responsibilities like Adrienne Moorefield, Morgann Carlon and Irma Arellano, were assigned less work as compared to the plaintiff, were not as heavy workload as the plaintiff, were not released from multiple projects, and were not given a bad performance rating due to their race or national origin. This shows defendant's discriminatory motivation towards the plaintiff based on his race and/or national origin.

228. After learning about plaintiff's medical condition and disability, in December 2017 and January 2018, various defendant Caucasian employees began abusing their power and authority and retaliated against the plaintiff. For example, Victor Bocking and William Murphy sent the plaintiff to interview for a project where he was destined not to be hired due to lack of relevant experience. Christina Young accused the plaintiff of buying an airplane ticket without her approval, when in-fact the air-ticket was a requirement placed by the UK consulate to obtain a visa, and she herself suggested that the air-ticket dates can be later changed per revised project dates, if any, for a nominal fee. These employees maintained unlawful discriminatory bias against the plaintiff, and the terms, conditions or privileges of his employment due to his national origin and race. Plaintiff was singled out against similarly situated employees, like Adrienne Moorefield, who were neither sent on projects for which they destined not to be hired due to lack of relevant experience, nor were falsely accused of buying an airplane ticket by their supervisor of a different race.

229. Similarly, Christina Young, a 61-year old White American national of Caucasian descent, filed falsified and malicious sexual harassment allegations against the plaintiff. Her malicious allegations and impermissible bias in plaintiff's employment tainted the ultimate employment decision and led to plaintiff's termination. Plaintiff's human resource managers of Caucasian descent further maintained a discriminatory bias against the plaintiff, and the terms, conditions or privileges of his employment by not informing or interviewing him about the issue. Thus, Plaintiff was singled out, and the biased actions of Christina Young along with plaintiff's human resource managers, Joanna Rohde and Brenda Arends, meaningfully impacted the process leading to plaintiff's material loss of employment benefits, and his termination.

230. Similarly, after learning about plaintiff's medical condition and disability, and malicious sexual harassment allegations against him, February 2018 onwards, various defendant Caucasian employees began abusing their power and authority and retaliated against the plaintiff. (a) Amye Hanes released the plaintiff from Mergers & Acquisition (M&A) project. (b) Katie Wittenbraker, Brenda Arends and Joanna Rohde intentionally falsified statements on plaintiff's personnel file, (c) Brenda Arends and Joanna Rohde asked him to sign a malicious letter of reprimand, and (d) gave him a permanently bad performance rating. Thus, Plaintiff was singled out, treated differently than similarly situated employees like Adrienne Moorefield, and the actions of each of defendant employees with discriminatory intent meaningfully impacted the process leading to plaintiff's material loss of employment benefits like compensation increase, and his termination.

231. On March 6th 2018, defendant released the plaintiff from the 21st Century Fox Channel project. Defendant replaced the plaintiff with a less qualified junior employee with just 1.5 years of experience, Emerson Marenyi, an employee of Caucasian background claiming him to be a subject matter expert. The defendant treated Emerson Marenyi more favorably than the plaintiff. Such repeated harassments by the defendant interfered with plaintiff's job performance. Upon information & belief, this release was planned by Deloitte Human Resource Manager Joanna Rohde, who called the plaintiff shortly after his project release meeting. Her discriminatory bias is evident as she had been meaningfully involved and working behind the scenes in the process leading to and following plaintiff's malicious sexual harassment allegations and plaintiff's ethics complaint

232. In March 2018, plaintiff on a call with Joanna Rohde mentioned that he had allergies of active nature, he carries an Epipen, he consumed alcoholic beverage at the event, he blacked out and likely suffered an anaphylactic reaction. However, Joanna Rohde herself drew a direct conclusion and wrote in her notes that the "plaintiff's doctor said plaintiff is allergic to alcohol.". Thus, the Deloitte HR professional knowingly captured selected piece of information to their advantage, discriminating against the plaintiff on the basis of his disability, gender and race. Plaintiff was singled out and treated differently than similarly situated Caucasian female employees, like Adrienne Moorefield, who did not experience any of the above discriminations.

This also further shows that plaintiff's disability / medical condition, gender, race and national origin claims are intertwined.

233. Similarly, upon information & belief, plaintiff's Talent Relation Manager, Joanna Rohde, US National of Caucasian descent, acted with racial animus and hostility towards the plaintiff in light of a medical condition / disability, and malicious sexual harassment allegation by another Caucasian female by (a) by coordinating internally and requesting plaintiff to be released from J.P Morgan Chase project in Dec. 2017, (b) by creating the malicious letter of reprimand for the plaintiff in Feb. 2018, (c) by using her position and authority to intentionally sabotage plaintiff's personnel file and give the plaintiff a permanently bad performance rating in Feb. & Mar. 2018, (d) by treating Christina Young more favorably than the plaintiff by not informing or interviewing him about the malicious sexual harassment case in Jan. - Feb. 2018. Plaintiff was singled out by Joanna Rohde as she maintained her discriminatory intent on the basis of plaintiff's race, and treated him differently than similarly situated Caucasian female employees like Adrienne Moorefield, who did not experience any of the above discriminations.

234. In early October 2018, defendant placed the plaintiff on project which required deep knowledge of the healthcare industry. On Oct. 9th 2018, the plaintiff communicated to his project Sr. Manager, Tim Van Ee, that the plaintiff is skeptical about leading the client project because *plaintiff has no experience in health plans, health care, clinical data or Epic data*. In addition, plaintiff had *no experience in Microsoft Azzure* which was required for the project. The senior manager confirmed that "*he will help the plaintiff*", and plaintiff's lack of knowledge in the field should not be an issue as it is just "*industry stuff*".

235. On or about Oct. 10th 2018, when the plaintiff requested formal training on the project, Tim dismissed plaintiff's training request, stating the he will help the plaintiff with the specifics, mentioning that the plaintiff may reach out to colleagues for project deliverables from other clients, and may further research about technologies like Microsoft Azzue and Health Care data (*Epic*) on Deloitte portal and further online. Hence, until mid-October, defendant Sr. Manager, Tim Van Ee desperately wanted to keep the plaintiff on his project even after knowing that the plaintiff had very little to no skills in one or more of the subject areas. Tim Van Ee was plaintiff's

supervisor on this Kaiser Permanente project. His supervisory oversight suggests that he had input in the final decision of plaintiff's termination two weeks later in early Nov. 2018.

236. Thus, plaintiff was assigned a role where he had no industry experience and no formal training. With benefits of hindsight and months of facing a continued pattern of harassment by the same set of defendant employees, Plaintiff came to understand that these carefully planned project assignment tactics and methods like assigning plaintiff on to short-term projects where plaintiff had no industry knowledge or experience, no formal training, and outside of his skill-set and expertise, were specifically meant to target the plaintiff making his project assignments more difficult. Such repeated harassments by the defendant interfered with plaintiff's job performance.

237. Earlier, plaintiff was assigned a project at Anthem, where he was assigned disproportionately heavy workload of two fulltime employees with racial animus. The project team threatened the plaintiff will negative performance rating and consequences for raising such project and workload issues. Plaintiff attended an integrity and ethics firm wide training, and thought it was his duty to report instances of ethics and workplace conduct violation. Subsequently, the defendant retaliated against the plaintiff by not interviewing the witnesses identified by the plaintiff, assigning him negative performance review, inaccurately paraphrasing plaintiff's account of events, not informing the plaintiff with the outcome of the investigation, assigning him a malicious letter of reprimand and threatening him with termination. Soon thereafter, plaintiff's Caucasian resource managers limited project opportunities available to the plaintiff, and it became apparent that the defendant did not want to assign the plaintiff projects where he had the right experience and skillset.

238. Defendant knew that it had discriminated and retaliated against the plaintiff several times before, and plaintiff could make a claim against the defendant. Defendant wanted to dissuade the plaintiff from making or supporting a charge of discrimination, therefore, it carefully engineered plaintiff's project assignments by placing him in projects where he had no client or subject matter experience and projects assigned with favorable defendant supervisors, such that, it would become harder for plaintiff to prove good results in spite of his great efforts. Plaintiff had to work twice as hard on such projects as they constituted disproportionally heavy workload for the plaintiff. Such repeated discriminatory and harassment practices by the defendant Caucasian supervisors and resource managers interfered with plaintiff's job performance, and change in

project responsibilities were so frequent and significant as to constitute a setback in plaintiff's career. For example, considering project opportunities outside his core skillset and expertise in Life Sciences and Finance constituted a setback in plaintiff's career both his competence and expertise in these specific sectors and subject areas.

239. On October 17th 2018, plaintiff's female counselor reached out to the plaintiff to get specifics about the Kaiser Permeante project and the Sr. Manager, Tim Van Ee. Soon thereafter, defendant Sr. Manager, an employee of Dutch background, notified the plaintiff that the plaintiff would be released from his project. On October 18th 2018, defendant Sr. Manager, Tim Van Ee, stated plaintiff was an "*expendable Indian*". He again apologized to the plaintiff this time over instant message by saying "*no hard feelings, sorry that came across wrong*". The defendant terminated the plaintiff less than two weeks after this incident. Tim Van Ee's criticism of plaintiff in ethnically degrading terms and his discriminatory behavior combined with a project assignment where plaintiff had no industry experience and was denied training rating constitute adverse employment action.

240. On Oct. 12th 2018, three business days before this incident, Brenda Arends mentioned in her notes that the plaintiff was having performance issues. On Oct. 17th 2018, she coordinated internally to get the plaintiff released. Upon information & belief, Tim was instructed by someone higher up, likely based on circumstances including sequence of events and timing, by Brenda Arends, who was a decision maker in plaintiff's termination, to intentionally use these words to cause racial degradation and significant emotional distress to the plaintiff. Plaintiff was singled out and treated differently than similarly situated employees Youmna Saloumi, Adrienne Moorefield, who did not experience such racial hatred and/or were not terminated based on their race.

241. On October 18th 2018, defendant replaced the plaintiff with Morgann Carlon, a US National female employee of Caucasian background. Defendant replaced plaintiff on projects with employees outside his protected class. The defendant discriminated against the plaintiff on the basis of his national origin and race by treating Morgann, a female US national, more favorably than the plaintiff. Morgann was also not subjected by vitriolic comments made by the Senior Manager. The sequence and timing of plaintiff's discharge within two weeks of this incident suggests that defendant terminated plaintiff due to his national origin and race.

242. For the years 2016-2018, Plaintiff was similarly situated to employee, Morgann Carlon, female Senior Consultant, Deloitte Strategy and Analytics, performed similar work consisting of the same or similar duties including, but not limited to advising clients, leading and/or contributing to client work or projects, building firm eminence, contributing to internal firm initiatives and client proposals, collaborating with and/or mentoring junior staff, etc. They both were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment. Morgann did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation filed against her. At the end of August 2018, Morgann got promoted to a Manager, just one month before the Kaiser Permanente project started.

243. In this case, plaintiff's Human Resource Manager, Brenda Arends, US National of Caucasian descent, a decision maker on plaintiff's termination, acted with racial animus and hostility towards the plaintiff in light of a malicious sexual harassment allegation by another Caucasian female due to the following reasons, (a) by delivering the malicious letter of reprimand to the plaintiff in Feb. 2018 (b) by using her position and authority to give the plaintiff a permanently bad performance rating in in Feb. & Mar. 2018, (c) by misrepresenting his medical condition on his personnel file in Feb. 2018, (d) by wrongly stating that plaintiff has issues with women, and women in supervisory positions on multiple occasions, (e) by communicating to her colleagues that the firm needs to move forward with plaintiff's termination regardless of his performance or positive opinions by his supervisors in Oct. 2018, (f) by working exclusively with plaintiff's female counselor to falsify plaintiff's performance reviews and release him from projects with intimidation and racial insults, and (g) by finally terminating plaintiff's employment.

244. Thus, Brenda Arends, a decision maker in plaintiff's termination, harbored prejudice against the plaintiff, and her racial animus is evident from the statements above. Plaintiff was singled out by Brenda Arends who maintained her discriminatory intent on the basis of plaintiff's gender and race, and treated him differently than similarly situated Caucasian female employees like Adrienne Moorefield, who did not experience any of the above discriminations.

245. Racially insensitive comments by plaintiff's supervisors and actions by human resource managers, distressed the plaintiff emotionally. Plaintiff was singled out as against similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, Irma Arellano and Morgann Carlon, who did not experience racial animus against them by defendant employees from various ethnic and racial backgrounds, and were not discriminated based on their national origin. Upon information and belief, these similarly situated employees did receive bonuses and compensation increase per their annual incentive plan (AIP), were not released from multiple projects, were not given a bad performance rating, and were not terminated by the defendant due to their performance.

246. Previously, various Caucasian Deloitte employees had acted against the plaintiff due to a combination of intertwined factors including his disability, gender, national and racial origin. (a) Christina Young filed falsified malicious sexual harassment allegations against the plaintiff. (b) Amye Hanes released the plaintiff from projects. (c) Shanah Setzen made sure plaintiff would not get staffed on projects. (d) Austin Perez falsified a report on plaintiff's ethics and integrity complaint. (e) Brenda Arends falsified statements about plaintiff's medical condition and maliciously modified plaintiff's performance records. The evidence is overwhelming, the defendant has racially discriminated against the plaintiff based on his national origin and racial background, and the timing and sequence of their actions fueled by discriminatory intent lead to plaintiff's termination

247. Plaintiff was also subjected to different standards of project selection by his Human Resource Managers Amye Hanes and Shanah Setzen. However, upon information and belief, similarly situated employees, like Adrienne Moorefield and Irma Arellano, US Nationals, who did not suffer from life-threatening allergies or disabilities and did not have a malicious sexual harassment allegation against them, were not deprived of project opportunities, were not rejected for projects where they had the right skillset, were not sent to client project opportunities where they were destined not to be hired, were not staffed on projects which required deep knowledge of an industry which they did not have. Defendant as such singled out the plaintiff, treated him differently than similarly situated US national employees, harassed him, and forestalled his professional and career growth.

248. The defendant carried out an ongoing scheme to intimidate, harass and force the plaintiff out of the company, because the defendant knew it would be illegal to terminate him based on the malicious sexual harassment allegation by a Caucasian woman, as the plaintiff could claim discrimination and retaliation for such termination. So, instead, various defendant employees of different ethnic and racial backgrounds choose to mock and harass based upon his national origin and race (a) by intimidating and threatening him with deportation and termination, (b) by deliberately mocking him on his racial background and releasing him from projects, and after each project release (c) by deliberately making him wait for multiple weeks to start a new assignment based on his national origin visa limitation, (d) by not following its internal process and protocols of interviewing the plaintiff on the malicious sexual harassment allegation, (e) by letting his Caucasian HR managers subject him to different standards for project selection and performance evaluation, and (f) by falsely engineering his performance rating, and finally (g) by eventually terminating his employment.

249. Plaintiff would not have suffered an adverse employment action, his termination, if the plaintiff (a) was not discriminated on the Anthem project based on his national origin and race and was not given disproportionately heavy workload by his white supervisor for which he filed an ethics report, (b) was not released from the JP Morgan Chase project because he was helped for his disability incident by a White Sr. Partner, (c) was not sent to interview for a project where he was destined not to be hired due to lack of relevant experience, (d) was not accused by his White supervisor of buying an airplane ticket without her approval, (e) was not falsely accused by a 61-year old White female of inadvertently touching her behind, (f) was not treated less favorably than the female accuser, (g) was not informed or interviewed about the malicious sexual harassment case.

250. Based on the above allegations, one may deduce that because of plaintiff's national origin and race, as he was non-White, his White female Supervisors and Human Resource Managers – Ashley, Christina, Joanna, Brenda, Katie, Amye, and Shanah – maintained a racial bias against the plaintiff and treated the plaintiff differently than similarly situated employees. Plaintiff was as such singled out and treated differently than similarly situated employees based on his race and national origin. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

251. Similarly, Plaintiff would not have suffered an adverse employment action, his termination, if the plaintiff (a) was not released from projects and replaced by someone outside his protected class, (b) was not assigned short-term projects where plaintiff had no industry knowledge or experience, (c) was not deprived of project opportunities where he had the right skillset, (d) was not given a permanently bad performance rating, (e) was not given less favorable performance evaluation than his White Colleagues, (f) was not subjected to invidious actions and comments by his White supervisors. Thus, plaintiff was treated differently than similarly situated White employees, and the timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

252. Plaintiff's white supervisors and colleagues (a) released him from projects and sent him on projects where he was destined not to be hired, (b) accused the plaintiff of buying an airplane ticket without approval, (c) accused the plaintiff with impermissible bias of inadvertently touching the behind of a 62-year old woman, (d) treated the female accuser more favorably than the plaintiff, (e) replaced the plaintiff with a white employee more than once, and (f) sabotaged plaintiff's personnel file. Thus, defendant maintained a discriminatory bias against the plaintiff on the basis of his national origin and race.

253. In addition, plaintiff was subjected to a constant drumbeat of ridicule, (a) that his white supervisors and colleagues made racially insensitive remarks - plaintiff was called "deplorable" and "expendable Indian" - while his white colleagues were not, (b) that his white colleagues received favorable performance evaluations while plaintiff did not, (c) that his white colleagues were not restricted on seeking new client projects while several of plaintiff's applications were rejected with reason 'Project Closed Not Selected', (d) that his white colleagues were not subjected to recruitment fraud and technically not forced to leave the country while the plaintiff was, (e) that similarly situated employees did not have to go through the ordeal of getting released multiple times from multiple projects while the plaintiff was. Thus, defendant maintained a discriminatory bias against the plaintiff on the basis of his national origin and race, and plaintiff was subjected to different workplace standards than his white supervisors and colleagues.

254. Similarly, during plaintiff's employment, the defendant coordinated and released the plaintiff from his projects several other times. Each time the plaintiff got released, plaintiff had to struggle to find a new project. Due to his national origin and visa restrictions, before the plaintiff could start working on a new project at a new location, the plaintiff would need to first have his Labor Condition application certified by the Department of Labor (DOL), a process which would generally take between 7 - 10 business days to complete. After getting his Labor Condition application certified, the plaintiff could only start his work the day after his H-1B visa amendment was filed by the defendant's immigration team, a process that would generally take another week to complete. Thus, the plaintiff would need to wait anywhere between 2-3 weeks before he could start on a new project. During this time, the plaintiff would not be on a billable project, which would hurt his utilization and performance metrics. By releasing the plaintiff from different projects, the defendant intentionally and wantonly worked towards spoiling the plaintiff's utilization and performance metrics.

255. The Defendant Deloitte knew it would be illegal to immediately terminate the plaintiff based on his medical condition, falsified sexual harassment allegations and the protected characteristics or factors of a pregnant female supervisor, so the defendant resorted to engineering plaintiff's exit by taking advantage of his national origin by releasing him from projects, by causing emotional trauma based on his racial background by mocking him on and off projects, thus slowing and terminating his internal progress within Deloitte, and traumatizing him emotionally so he would himself leave the firm. The defendant failed to provide the plaintiff any cure on plaintiff's utilization and performance metrics negatively impacted by these repeated project releases and project start delays, or the negative stress induced by these forced project releases. The defendant schemed to illegally control the Plaintiff, blocked his pay-raise and promotion to the next level, constrained his career progression, constrained his civil and constitutional rights, endangered Plaintiff's health, wellbeing, reputation, and harmed Plaintiffs income, and financial resources.

256. For the years 2016-2018, Plaintiff and a similarly situated employees, Rishil Murukan M and Vaibhav Pawar, male Senior Consultants, Deloitte Consulting LLP, performed similar work consisting of the same or similar duties including, but not limited to advising clients, leading, and/or contributing to client work or projects, building firm eminence, contributing to internal

firm initiatives and client proposals, collaborating with and/or mentoring junior staff, etc. These employees, who were all foreign nationals, were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment and on the same work permit (H1B visa). Like others, Rishil and Vaibhav were subject to the same standards of governing performance evaluation and discipline as the plaintiff. Rishil and Vaibhav did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation filed against them.

257. Defendant Deloitte's similarly situated employees, like Rishil Murukan M and Vaibhav Pawar, who were foreign workers, comparable to the plaintiff on having a H1b work visa, did not have to go through the ordeal of getting released multiple times from multiple projects. Plaintiff was singled out against similarly situated foreign workers, who were not released multiple times from projects, who were not subjected to invidious actions and comments by their White supervisors, and who did not suffer the same career setback and emotional trauma as the plaintiff did.

258. Similarly, Defendant's similarly situated employees, like Adrienne Moorefield, who were U.S Nationals and/or U.S Permanent residents, comparable to the plaintiff on level or skills, did not have to go through the ordeal of waiting for 2-3 weeks before they could start working on a new project. Plaintiff was singled out against similarly situated US Nations and Permanent residents, who did not suffer from performance utilization impact due to visa related delays.

259. Similarly, for years 2017-18, Plaintiff was similarly situated to Todd Patman, a US National Manager at Deloitte Strategy and Analytics, with similar employment policies to the plaintiff, except he had additional managerial job responsibilities over project management and delivery. Upon information and belief, Todd neither was released from several projects, nor was harassed based on his ethnicity. And unlike the plaintiff, he also did not have to go through the ordeal of waiting for 2-3 weeks before he could start working on a new project.

260. Plaintiff would not have suffered an adverse employment action, his termination, if the plaintiff (a) was not treated differently than similarly situated White employees, (b) was not treated differently than similarly situated specialty immigrant employees on H1B visa, (c) was not deliberately made to wait for multiple weeks to start a new assignment based on his national origin visa limitation, (d) was not assigned biased supervisors and decision maker who acted

with racial animus and hostility towards the plaintiff. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

261. After termination, plaintiff applied to various jobs through Deloitte Marketplace website. A member of the Deloitte transition team, Aileen Baxter, had multiple coaching sessions with the plaintiff where she secured confidential information from the plaintiff as to which all firms plaintiff was interviewing at, and allegedly coordinated either directly with those firms or indirectly through other Deloitte or non-Deloitte Human Resource managers to make sure that the plaintiff could not secure alternate full-time employment. Upon information and belief, Plaintiff was treated differently than other Deloitte employees who successfully used Deloitte transition services and got recruited.

262. Defendant Deloitte disrupted plaintiff's progress and his right to seek alternate employment at other firms. One incident alone can seem coincidental; however, multiple instances with similar actions and results are unlikely to be coincidental. The evidence for recruitment fraud on plaintiff's employment lawsuit is overwhelming, the defendant Deloitte has used illegal means to track into plaintiff's communications and exerted their influence on innocent recruiters from prestigious firms to further their scheme to illegally control the Plaintiff, deny his rights and freedom to find equal opportunity employment, constrain his civil and constitutional rights, endanger Plaintiffs life, health, wellbeing, and reputation, and harm Plaintiffs income, financial resources, and access to credit.

263. After termination, during the course of next months, defendant's interference and harassment on plaintiff's day to day life activities increased. The facts presented below highlight the unlawful and illegal harassment activities by the defendant, Deloitte Consulting LLP, including activities by their employees, agents, contractors, and servants under their control, after plaintiff's termination. After plaintiff's termination, plaintiff was offered to use defendant Deloitte Consulting LLP's career transition services. While using defendant's career services, Plaintiff witnessed massive recruitment fraud, which was primarily orchestrated by defendant to harass the plaintiff based on his national origin, race and visa-based work permit limitations.

264. During plaintiff's employment, defendant, Deloitte Consulting LLP, contrived a set of fraudulent events to maintain and enhance their illegal control of the plaintiff as mentioned on plaintiff's employment lawsuit. These activities continued after plaintiff's termination, for instance, Plaintiff applied to various jobs at different companies to secure gainful alternate employment. However, the defendant in a carefully calculated plan to illegally interfere with plaintiff's rights, primarily organized, orchestrated, managed and terminated these employment opportunities for which the plaintiff was primarily qualified. These fraudulent manipulations and misrepresentations add to defendant's long-running series of plans and actions to coerce, manipulate and illegally control the plaintiff.

265. During his employment, after the defendant became aware of plaintiff's medical condition / disability, protected factor of a pregnant female supervisor, and a false complaint by a woman twice plaintiff's age, defendant resorted to falsely engineering a non-discriminatory performance-based reason to wrongfully terminate the plaintiff to avoid legal liability. Defendant knew that plaintiff was a minority employee of Indian origin working for the defendant on H-1B visa. The defendant knew that plaintiff would have 60-days to find another job or exit the country. The defendant terminated the plaintiff on November 5th 2018, close to the US holiday season, in order to make it even harder for him to find another job.

266. As explained in plaintiff's employment complaint, and further explained in this complaint, after his termination, in an effort to maintain an illegal control of the plaintiff, defendant made every effort possible to make sure that the plaintiff is not able to secure suitable alternate employment within the allotted 60-day grace period given by the government. By coordinating with and conferring with the Human Resource departments of other firms, defendant discriminated and retaliated against the plaintiff on his national origin and race, and acted with reckless indifference to the state & federally protected rights of the plaintiff.

267. After his termination, in November 2018, plaintiff was offered to use defendant Deloitte Consulting's career transition services. Plaintiff was assigned a career coach, named Aileen Baxter, and was given access to a career transition website where plaintiff could apply for jobs at other firms. The defendant knew that plaintiff was on H1B specialty work visa, and that the plaintiff would have just two (2) months until after his termination to find a new job or leave the

country. The defendant concocted a malicious scheme to tortuously interfere with plaintiff's employment interests by (a) sending plaintiff on sham interviews, (b) sending plaintiff on interviews which did not support H1B work visa sponsored employment, (c) sending plaintiff on interviews that did support H1B visa but were carefully placed to cause plaintiff to expend his time and resources on fraudulent employment opportunities, and (d) in December 2018, by intentionally revoking his access to the defendant transition website so plaintiff could not apply for jobs at other firms.

268. After plaintiff's termination, in November and December 2018, Plaintiff used Deloitte Consulting LLP's career transition portal to apply for full-time employment opportunities at the different firms for the following roles (a) CVS Health as *Director, Retail Strategic Projects*, (b) McKesson as *Sr. Manager Corporate Strategy*, (c) Kohls as *Sr. Strategy Manager*, (d) Vanguard as *Sr. Manager Strategy & Planning*, (e) Hewlett Packard for a role at their *Personal System Strategy* Team, and (f) IBM and State Street for various roles at their *Data Management Marketing Roles* and *Transformation Strategy Roles* respectively. Plaintiff's profile was selected at each of these firms; however, none of these firms offered visa-sponsored employment for these specific positions. Upon information and belief, defendant conspired against and prevented plaintiff from seeking alternate visa sponsored employment by selectively releasing plaintiff's profile to firms where plaintiff was destined not to be hired because of his visa limitation.

269. Similarly, in November & December 2018, Plaintiff used Deloitte Consulting LLP's career transition portal to apply for full-time employment opportunities at the different firms for the following roles (a) Microsoft as *Workplace Analytics Manager*, (b) J.D Power & Associates as *Director PIN data and Analytics*, (c) Keurig Dr. Pepper as *Channel Strategy Manager*, (d) Jet.com as *Analytics Manager*, and (e) VMWare as *Lead Business Analytics*. Plaintiff was invited and subsequently interviewed at each of these firms, however, plaintiff was not selected for a full-time position. Upon information & belief, Defendant used plaintiff's job applications through Deloitte career transition portal and his interviews as a ruse and subterfuge in part to knowingly abuse plaintiff's visa limitation, in part to facilitate gathering of intelligence information on plaintiff, in part to cause plaintiff to unnecessarily expend time and resources on fraudulent interviews, and in part to continue their maliciously pattern to illegally control the plaintiff.

270. During his coaching sessions with the plaintiff, defendant coach, Aileen Baxter, would secure confidential information from the plaintiff, as to where all he applied and interviewed, and coordinate with employers to ensure plaintiff could not secure alternate employment. Defendant employees, specially female members of defendant Human Resource department, were aware, and acted together and separately to aid and abet, and facilitate the illegal control of the plaintiff as described in this complaint, against plaintiff, his interests and his civil and constitutional rights, and at all other times failed to properly act and properly supervise employees, agents, contractors, and servants under their control. Upon knowledge and belief, the defendant employees responsible for these activities against the plaintiff include, Human Resource Professionals Brenda Arends, Aileen Baxter, Amye Hanes, Shanah Setzen, Joanna Rohde and others not known to the plaintiff.

271. During his coaching sessions with the plaintiff, a member of the Deloitte transition team, Aileen Baxter, secured confidential information from the plaintiff as to which all firms plaintiff was interviewing at, and upon information & belief, allegedly coordinated either directly with those firms or indirectly through other Deloitte or non-Deloitte Human Resource managers to make sure that the plaintiff could not secure alternate full-time employment. The facts identified below outline defendant's malicious recruitment fraud activities outside of their career transition services. Plaintiff applied to these positions himself.

272. On December 4th 2018, Plaintiff started interviewing at Teva Pharmaceuticals. On December 11th 2018, the Teva Pharma recruiter invited the plaintiff for his final round of interview. Later that same day, on a meeting with Deloitte transition services coach, Aileen Baxter, the Plaintiff was asked where he was interviewing outside the Deloitte Market Place job portal. The plaintiff naively and honestly disclosed his final round of interview with firm Teva Pharmaceuticals to Aileen Baxter.

273. Next day, on December 12th 2018, early morning, Teva recruiter confirmed plaintiff's final round interview both by phone and email. The interview was scheduled for the next day, December 13th 2018. However, as the day progressed, Teva recruiter sent an email to the plaintiff canceling plaintiff's final round of interview, stating that the process has been put on

hold. Based on direct evidence, and upon information and belief, it is evident that Aileen Baxter leaked plaintiff's confidential information and coordinated either directly or indirectly though other Deloitte or non-Deloitte Human Resource managers to make sure that the plaintiff could not secure alternate full-time employment at Teva Pharmaceuticals. Aileen Baxter conspired against and prevented Plaintiff from seeking alternate private sector employment, thereby further harassing and retaliating against the plaintiff based on his national origin and visa restriction.

274. Similarly, on December 11th 2018, plaintiff mentioned about his interviews at indeed.com and wayfair.com to Aileen Baxter. The interviews had similar outcome as above, Plaintiff got his rejection from indeed.com around December 13th 2018, and from wayfair.com on December 17th 2018. Thus, upon information & belief, Aileen Baxter conspired against and prevented Plaintiff from seeking alternate private sector employment, thereby further harassing and retaliating against the plaintiff based on his national origin and visa restriction. Upon information and belief, Aileen's behavior towards the plaintiff was tainted by discrimination based on gender stereotypes.

275. In early 2019, plaintiff applied to two roles at firm MassMutual - Project Manager (Data Science and Analytics), and Director Product Management. In February 2019, MassMutual recruiter reached out to the plaintiff for the Director Product Management position. However, late February, plaintiff logged on to the MassMutual recruitment website to learn that his underlying employment applications were deleted with just the application name remaining intact. Upon information and belief, the defendant made an ongoing effort to retaliate against the plaintiff, by first invading his privacy and reading his emails through cyber-espionage, then coordinating with MassMutual team to first change the title of plaintiff's application / position from Director Product Management to Project Manager (Analytics and Data Science), then deleting plaintiff's underlying application from MassMutual system, and then sending a rejection letter to the plaintiff of not being selected.

276. In early 2019, before filing his employment lawsuit, plaintiff applied for a Director, Commercial Effectiveness position at Pharmaceutical firm GlaxoSmithKline (GSK). On February 18th 2019, the Human Resource Manager of GSK invited the plaintiff for an interview for this position. On February 22nd 2019, the plaintiff held an interview with a Senior Director within GSK for his role, the interviewer really liked plaintiff's profile and said that plaintiff would hear back from

the recruiter next week. Upon information & belief, the miscreates from defendant, Deloitte Consulting LLP, gained access to plaintiff's emails and phone conversation by illegal means, reached out the GSK recruiter, Kim Saintz, and disrupted plaintiff's progress by stalling his interviews at the Equal Opportunity Employer GSK. Plaintiff's progress is evident because the recruiter invited the plaintiff for the next round of the interview, however, knowingly did not schedule it.

277. Upon knowledge & belief, on or around the time of filing this complaint on April 7th 2021, the firm Deloitte Consulting LLP has moved eight (8) to twelve (12) employees mentioned on plaintiff's employment lawsuit to other firms. The firm Deloitte is hoping to limit their liability on plaintiff's lawsuit, and appears to have used their privileged court access to delay plaintiff's valid claims such that the employees moved on plaintiff's lawsuit are not able to file a claim against Deloitte. Upon knowledge & belief, delaying or denying plaintiff his gainful employment opportunities or other government benefits is a part of their strategy to limit their firm liability on this lawsuit.

## Discrimination by Apple based on Plaintiff's National Origin & Race

278. The Plaintiff applied for multiple positions at Apple. The Apple female White recruiter Caitie selected plaintiff profile and reached out to the plaintiff. The plaintiff was qualified for the position at all times. However, after learning about plaintiff's pending employment lawsuit against Deloitte, and the nature of allegations on plaintiff's employment lawsuit such as a (a) malicious sexual harassment allegation by a White woman twice the age of plaintiff, (b) assignment of disproportionately heavy workload by a White Woman, (c) invidious comments and racial discrimination by Supervisors, (d) plaintiff's disability, the defendant Apple refused to hire the plaintiff.

279. Defendant Apple Recruiter, Caitie Wojdak, was a White US National Female supervisor at Apple. Her supervisory oversight over plaintiff's recruitment suggests that she had input in the final decision of Apple's refusal to hire the plaintiff.

280. After defendant Apple learned about plaintiff's employment lawsuit against Deloitte and the malicious sexual harassment allegation by a White woman twice the age of plaintiff, the defendant Apple refused to hire the plaintiff. By refusing to hire the plaintiff, defendant Apple refused to make an employment contract (as a fulltime employee) with the plaintiff on non-discriminatory terms. (Failure to hire on the basis of race is the same as not offering an employment contract on racially neutral terms. Such acts are actionable under 42 USC § 1981 which cover all types of contracts, not just employment contracts)

281. Upon knowledge & belief, Plaintiff's racial discrimination claims against Deloitte, Deloitte White HR Joanna Rohde's involvement and influence on plaintiff's employment case, sexual harassment allegation by a White 62-year old female and upon knowledge & belief, protected characteristics of a White female supervisor at Deloitte, are some of the factors that the White Apple Recruiter considered on plaintiff's recruitment at Apple.

282. By refusing to hire the plaintiff, defendant Apple knowing impaired plaintiff's same right to make an employment contract as a fulltime employee as White US Citizens. Apple was not only unwilling to make or enter into a nondiscriminatory employment contact with the plaintiff, it refused to enter an employment contract with the plaintiff on racially neutral terms. The existence of several racial discrimination allegations at Deloitte and Apple recruiter's change in behavior after learning of these allegations suggest that the White Apple recruiter (a) considered such factors in her decision and (b) was racially biased on offering an equal employment opportunity to the plaintiff at Apple.

283. The Federal Court of the Southern district of New York has already approved plaintiff's racial discrimination claims on his employment lawsuit and denied defendant Deloitte's motion to dismiss such claims. Since the defendant Apple and defendant Deloitte acted in concert to deny plaintiff's application for employment at Apple on the basis of known factors (a) plaintiff's White Supervisor alleging sexual harassment at Deloitte, (b) plaintiff's White Supervisor assigning the plaintiff disproportionately heavy workload, (c) plaintiff's White Supervisor making invidious comments on plaintiff's race and national origin, (d) Deloitte's differential treatment of the plaintiff as compared to similarly situated employees, (e) Deloitte failed to train the plaintiff for positions on the basis of his race, such purposeful race based discrimination at Apple must not be accepted.

284. By refusing to hire the plaintiff, that is by refusing to make or enter into a new employment contract as a fulltime employment opportunity, that provided an opportunity for a new and distinct employer- employee relationship, defendant Apple discriminated against the plaintiff on the basis of his race. In fact, by refusing to hire the plaintiff, defendant Apple knowing impaired plaintiff's same right to make a new employment contract as White US Citizens.

285. Apple Recruiter, Caitie Wojdak, a White Caucasian US knew about plaintiff's race and national origin discrimination allegations against Deloitte Consulting LLP. On or about February 4th 2020, the plaintiff specifically notified the Apple Recruiter, Caitie Wojdak, about his pending federal employment lawsuit against Deloitte and about his race and national origin discrimination allegations against Deloitte over the phone, on February 6th 2020 over the email and on February 7th 2020 over a voicemail.

286. For the years 2019-2021, Plaintiff and a similarly situated to Apple White female employees, Elizabeth Robertson and Clararose Voigt. Both plaintiff, Elizabeth and Clararose had almost the same number of years of work experience. Elizabeth and Clararose worked on similar positions that required similar skill, effort, and job responsibilities at Apple, which is comparable to plaintiff's Client Consulting work at Deloitte. Elizabeth and Clararose were subject to the same standards of fulltime employment discrimination laws at Apple, as the plaintiff at Deloitte. These employees had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

287. For the years 2019-2021, Elizabeth Robertson and Clararose Voigt were internally promoted by Apple for similar positions that the plaintiff applied to, however, the plaintiff was not hired. Upon knowledge and belief, Kristen and Alicia did not suffer from a malicious sexual harassment allegation at Apple, were not discriminated by Apple on the basis of protected characteristics of a pregnant female supervisor or their race. Plaintiff had the additional experience of representing himself on an employment discrimination lawsuit in both State & Federal Court, however, upon knowledge and belief, applicants Kristen and Alicia lacked the plaintiff's experience with courts. Elizabeth Robertson and Clararose Voigt also lacked

plaintiff's diverse work experience dealing with several multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

288. Apple singled out the plaintiff and treated the Plaintiff differently than similarly situated White female employees, Elizabeth Robertson, Clararose Voigt, who did not suffer from gender discrimination by their previous empoloyer or by Apple in the form of sexual harassment allegation or protected female factor like pregnancy, or were not discriminated at Apple based on their race. Elizabeth Robertson and Clararose Voigt, full-time Apple employees who were outside of plaintiff's protected gender and race class, were internally promoted by Apple for similar positions that the plaintiff was not hired for.

289. Similarly, Defendant Apple's similarly situated applicants, like Kristen Bautzmann and Alicia Faustyn, who were U.S Nationals and/or U.S Permanent residents, did not have to go through the ordeal of having their employment application at Apple denied. Plaintiff applied for positions at Apple, was qualified for an available position at Apple, was rejected by Apple, and after plaintiff's rejection Apple hired a White applicants Kristen and Alicia as employees. Defendant Apple's actions suggest that White US National Female applicants and employees were given preference over the Non-White Foreign National Male plaintiff.

290. Defendant Apple's similarly situated applicants, like Giridhar Balasubramanian and Jitendra Bambhroliya, who were foreign workers and later hired by Apple as employees, comparable to the plaintiff on having a H1b work visa, did not have to go through the ordeal of having their Apple application denied after being selected by the Apple recruiter. Plaintiff was singled out against similarly situated foreign workers, who did not have a pending discrimination lawsuit based on race and national origin against their previous employers, who did not have a false and malicious sexual harassment allegation by a woman twice their age by their previous employer, and who did not suffer the same career setback and emotional trauma as the plaintiff.

291. In fact, US National employees were hired after Apple rejected the plaintiff. Dustin Mcgruder was hired in April 2020, Homer Chen was hired in May 2020, Michelle Ly was hired in June 2020 and so on. Plaintiff was singled out against similarly situated US Nations and Permanent

residents, who did not have a filed Federal employment lawsuit against their previous employer based on race and/or national origin in a Federal court.

292. In fact, plaintiff was more qualified than similarly situated White employees Dustin Mcgruder, Justina Greene, Brynnan Green, Nicholas Wittmer. The applicants were hired for the Program Manager position/s after Apple started their recruitment process with the plaintiff. Plaintiff had more experience in terms of diverse Client Consulting Experience in different industries over 8+ years, and experience with the court that gave him an added advantage as an applicant. Such actions show that Apple was unwilling to enter into a non-discriminatory employment contract as a fulltime employee with the plaintiff.

293. After the plaintiff provided the complete information on his pending employment lawsuit with Deloitte on February 7th 2020, the Defendant Apple knew it would be illegal to immediately terminate plaintiff's recruitment. So the defendant Apple waited until end of March 2020 to inform the plaintiff that he was not selected for the position. The defendant resorted to engineering plaintiff's advancement by slowing recruitment progress within Apple, by not responding to email messages by the plaintiff, and by terminating plaintiff's application by providing no substantive legitimate reasons for such denial or failure to hire.

294. Apple hired applicants who were less qualified than the plaintiff. Upon knowledge & belief, Apple used applicant's paper credentials to determine who would be selected for interviews. White US based applicants such as Justina Greene, Brynnan Green, Nicholas Wittmer had comparative less 'Paper' qualifications than the plaintiff, yet were not only selected for interviews but also hired by Apple. Upon knowledge & belief, Apple knowingly misjudged and disregarded plaintiff's job qualifications, and plaintiff was not able to enjoy the same employment privileges as offered to White employees.

## CAUSE OF ACTION

### COUNT ONE
**(Against Defendant Apple)**
**Discrimination based on Disability / Medical Condition**

*[in violation of Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq, and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.)]*

295. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

296. Plaintiff reported his disability / medical condition to the Apple recruiter. Because of Plaintiff's disability / medical condition, he belongs to a group of persons that Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq. and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq. intended to protect against discrimination in the terms and conditions of employment.

297. By the above-described acts, Defendant Apple discriminated against plaintiff because of his disability, by refusing to hire him for a fulltime position. Apple discriminated against Plaintiff with respect to terms, conditions and privileges of his employment because of his disability, through denial of his employment rights and benefits, and future promotions and achievements, by refusing to hire him, all in violation of Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.)

298. Further, Defendant Apple acted with indifference to both state & federally protected rights of the Plaintiff. At all relevant times, Plaintiff was qualified for his position with Defendant Apple.

299. Plaintiff's disability / medical condition was known to defendant Apple recruiter and the hiring team. Plaintiff was treated differently than others outside his protected class, and he suffered discrimination because of his disability / medical condition.

300. Because of Defendants' discriminatory actions, Plaintiff has suffered adverse employment actions in the form of failure to hire. Plaintiff has suffered an inability to earn a living at Apple and the unjust refusal to be hired.

301. Plaintiff also suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future.

## COUNT TWO

### (Against Defendant Apple)

### Discrimination based on Disability / Medical Condition

*[in violation of New York City Human Rights Law (NYCHRL),*

*N.Y City Admin Code § 8-101 et seq.)]*

302. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

303. Plaintiff was treated less well by defendant Apple than similarly situated applicants and/or employees based on his disability / medical condition

304. As mentioned above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. intended to protect against discrimination in the terms and conditions of employment.

305. By the above-described acts, defendant Apple is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.

306. Further, Defendant Apple acted with reckless indifference to federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is entitled to an award of compensatory & punitive damages in an amount to be determined at trial.

## COUNT THREE

### (Against Defendant Apple)

### Discrimination based on Gender

*[in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq, and*

*New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.)]*

307. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

308. Because Plaintiff was subjected to false & malicious sexual harassment allegations against him at Deloitte Consulting LLP, and because the plaintiff filed an employment lawsuit against Deloitte which was known to Apple, he belongs to a group of persons that Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq. and New York State Human Rights Law intended to protect against discrimination in the terms and conditions of employment.

309. By the above-described acts, Defendant Apple discriminated against plaintiff's gender because of the false and malicious sexual harassment allegations at Deloitte, by subjecting him to different treatment than other applicants, by tolerating and failing to take affirmative action to correct these unlawful employment practices, by discriminating against Plaintiff with respect to terms, conditions and privileges of his employment because of his gender, through denial of his employment rights and benefits, promotions and achievement, and by refusing to hire him as an employee, all in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq, and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.

310. Here, Defendant Apple took an adverse employment action against plaintiff, (a) in response to allegations of sexual misconduct at Deloitte, (b) following a clearly irregular investigative or adjudicative process by Deloitte, (c) without reacting adequately to allegations of sexual misconduct by members of one sex. The defendant Apple provided more favorable treatment to employees not in the protected group. Defendant Apple abandoned promised procedural protections under the law to the plaintiff. These circumstances support a case of sex discrimination.

311. Further, Defendant Apple acted with reckless indifference to both state & federally protected rights of the Plaintiff.

312. At all relevant times, Plaintiff was qualified for his role / application for full time position with Defendant Apple, and his job performance was very good. Plaintiff was treated differently than others outside his protected class, and he suffered discrimination because of his gender.

313. At Deloitte Consulting llp, Female HR professionals falsified plaintiff's performance report. Plaintiff was released from multiple projects by his female HR or female supervisors with discriminatory bias. Female HR falsified plaintiff's personnel file and incorrectly mentioned that plaintiff has issues with women, and women in supervisory position, in spite of several recommendations from women. Plaintiff's new project / staffing availability was limited by his female staffing resource manager. Deloitte treated similarly situated female employees better than the plaintiff.

314. Defendant Apple knew about plaintiff's allegations against Deloitte and his pending employment lawsuit. Defendant Apple refused to hire the plaintiff, and maintained a discriminatory bias against the plaintiff on the basis of his gender. Because of Defendant Apple's discriminatory actions, Plaintiff has suffered adverse employment actions, including his inability to earn a living at Deloitte Consulting and the unjust termination of his employment.

315. Plaintiff also suffered loss of past and future wages, as well as emotional distress, mental anguish, pain & suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future.

## COUNT FOUR

### (Against Defendant Apple)

### Discrimination based on Gender

*[in violation of New York City Human Rights Law (NYCHRL),*

*N.Y City Admin Code § 8-101 et seq., Stop Sexual Harassment in NYC Act]*

316. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

317. Plaintiff was treated less well by defendant Apple than similarly situated applicants and/or employees based on his gender

318. As mentioned above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq., and Stop Sexual harassment in NYC Act intended to protect against discrimination in the terms and conditions of employment.

319. By the above-described acts, defendant is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. & Stop Sexual harassment in NYC Act

320. Further, Defendant Apple acted with reckless indifference to federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is entitled to an award of compensatory & punitive damages in an amount to be determined at trial.

## COUNT FIVE

### (Against Defendant Apple)

### Discrimination based on National Origin & Race

*[in violation of 42 U.S.C 1981,*

*Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq,*

*New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.)]*

321. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

322. Plaintiff is a male of Indian nationality and is an Asian. Because of Plaintiff's national origin and race, he belongs to a group of persons that 42 U.S.C. § 1981, 42 U.S.C. § 2000e, et seq. (Title VII of the 1964 Civil Rights Act, as amended), and/or New York City Human Rights Law intended to protect against discrimination in the terms and conditions of employment.

323. By the above-described acts, Defendant Apple discriminated against plaintiff because of his national origin and race, by refusing to make an employment contract with the plaintiff on the basis of his race. In fact, by refusing to hire the plaintiff, defendant Apple knowing impaired

plaintiff's same right to make employment contract as a fulltime employee as White US Citizens actionable under 42 USC § 1981. (Failure to hire on the basis of race is the same as not offering an employment contract, actionable under 42 USC § 1981)

324. Apple's refusal to hire the plaintiff based on his race was a discriminatory conduct at the initial formation of the employment contract actionable under 42 USC 2000e-2(a). Apple was not only unwilling to make enter into a nondiscriminatory employment contact with the plaintiff, it refused to enter a contract with the plaintiff on racially neutral terms.

325. Defendant Apple knew about plaintiff's lawsuit against Deloitte. Apple knew about Deloitte's insinuating comments against the plaintiff based on his race and national origin. Apple knew that Deloitte had failed to take affirmative action to correct their unlawful employment practices. In order to protect their self-interests, Apple discriminated against the Plaintiff with respect to terms, conditions and privileges of his employment because of his national origin and race, through denial of his employment rights and benefits, promotions and achievement, and by failure to hire the plaintiff, all in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000e, et seq. (Title VII of the 1964 Civil Rights Act as amended) and/or New York City Human Rights Law

326. Further, Defendant Apple has acted with malice, in the alternative, with reckless indifference to the federally and statewide protected rights of the Plaintiff.

327. If the plaintiff did not have a pending employment lawsuit with racial discrimination allegations, and if the plaintiff did not have malicious sexual harassment allegations made by a 62-year old White female employee, defendant Apple's White recruiter would not have discriminated against the plaintiff on the basis of his race. In such a scenario, Apple would have continued its recruitment process with the plaintiff and plaintiff would likely have been hired for the position.

328. Plaintiff was treated differently than similarly situated White employees, and the timing, sequence and causal connection of these events suggest that but for defendant Apple's unlawful conduct based on plaintiff's national origin and race, plaintiff's failure to hire would not have occurred.

329. At all relevant times, Plaintiff was qualified for his position with Defendant Apple. The Plaintiff was treated differently than other applicants or employees outside of his protected class, and plaintiff suffered discrimination because of his national origin and race.

330. Defendant Apple knew about plaintiff's employment lawsuit against Deloitte on which plaintiff identified that Deloitte (a) criticized Plaintiff's performance in ethnically degrading terms, which included invidious comments being made by plaintiff's supervisors (b) replaced the plaintiff on projects with employees outside his protected class, (c) provided more favorable treatment to employees not in the protected group, and (d) the sequence and timing of events leading up to plaintiff's discharge, indicated that plaintiff's termination at Deloitte occurred under circumstances giving rise to an inference of discrimination on the basis national origin and race.

331. Defendant Apple maintained a discriminatory animus against the plaintiff by not hiring the plaintiff and by hiring less qualified White employees

332. The defendant Apple deliberately delayed and denied plaintiff's Application with Apple and his progress because of his race and national origin, and retaliated against him with motive after plaintiff filed disclosed his pending employment lawsuit against Deloitte.

333. Defendant Apple knew that Deloitte had created a workplace atmosphere against the plaintiff that was permeated with discriminatory intimidation, insult and ridicule that were sufficiently severe or pervasive to alter the conditions of plaintiff's employment with the defendant, and terminated his employment due to his national origin and race. Deloitte deliberately released the plaintiff from projects in spite of his good performance based on his national origin and/or race. The defendant deliberately gave the plaintiff a bad performance rating based on his national origin and/or race.

334. Defendant Apple treated similarly situated US based applicants and/or employees better than the plaintiff.

335. Because of Defendant Apple's discriminatory actions, Plaintiff has suffered adverse employment action, including his inability to earn a living at Apple Inc. and the unjust termination of his employment application.

336. As a result of Defendant Apple's discriminatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future

337. Due to the severity of Defendant Apple's conduct, Plaintiff is also entitled to an award of compensatory & punitive damages in an amount to be determined at trial.

## COUNT SIX

### (Against Defendant Apple)

### Discrimination based on National Origin & Race

*[in violation of New York City Human Rights Law (NYCHRL),*

*N.Y City Admin Code § 8-101 et seq.)]*

338. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

339. Plaintiff was treated less well at defendant Apple than similarly situated applicants and/or employees based on his national origin & race

340. As identified above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. intended to protect against discrimination in the terms and conditions of employment.

341. By the above-described acts, defendant is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.

342. Further, Defendant Apple acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is entitled to an award of compensatory & punitive damages in an amount to be determined at trial.

**COUNT SEVEN**

**(Against Defendant Apple)**

**RETALIATION**

*[in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq,*

*Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq,*

*New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

343. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

344. 42 U.S.C. § 2000e-3(a) of the Civil Rights Act of 1964 protects employees against retaliation by their employer. In addition, Americans with Disabilities Act (ADA) (42. U.S.C § 12101) also protects employees against retaliation by their employer.

345. Defendant Apple knew that plaintiff had filed an employment lawsuit against Deloitte, and thus engaged in a protected activity. Apple knew about Deloitte's pervasive discriminatory bias against the plaintiff, be it (a) Plaintiff's performance being criticized in ethnically degrading terms, (b) defendant replacing plaintiff on projects with employees outside his protected class, (c) defendant providing more favorable treatment to employees not in the protected group, (d) invidious comments being made by plaintiff's supervisors, and (e) the sequence and timing of events leading up to plaintiff's discharge, indicate that plaintiff's termination at Deloitte occurred under circumstances giving rise to an inference of discrimination on the basis of intertwined factors based on plaintiff's disability, gender and national origin and race.

346. Defendant Apple knew that in accordance with Deloitte Consulting's employee policy, Plaintiff had exposed misrepresentations by his supervisors where Plaintiff was given disproportionately heavy workload because of his race, and was threatened with termination. Defendant Apple knew that Plaintiff engaged in a Protected Activity at Deloitte.

347. Defendant Apple hired applicants or similarly situated applicants as fulltime employees who

were outside of plaintiff's protected class

348. Defendant Apple hired applicants or similarly situated applicants as fulltime employees who were less qualified than the plaintiff

349. Defendant Apple treated the plaintiff differently and less well than similarly situated US national and White employees based on his protected class, or national origin and race.

350. Had plaintiff's Apple recruiter not discriminated against the plaintiff after learning about plaintiff's protected activities, be it his employment lawsuit against Deloitte, or be it his protected activities at Deloitte, Apple would not have delayed and denied plaintiff's employment application, and thus, the plaintiff would not have suffered an adverse employment action at Apple.

351. After learning about plaintiff's protected activities, Apple refused to hire the plaintiff. In accordance with Apple's hiring policy, Plaintiff engaged in a Protected Activity by disclosing his employment lawsuit against Deloitte and through standing up for his rights.

352. Defendant Apple retaliated against the plaintiff with motive, and deliberately refused the plaintiff an opportunity to progress on his hiring process and interviews. Apple refused to hire the plaintiff in spite of him being qualified for the position at all times and liked by the recruiter.

353. Defendant Apple's discriminatory practices were a motivating factor in plaintiff's refusal to hire. The defendant was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff. The timing, sequence and causal connection of these events suggest that but for defendant's discriminatory and unlawful conduct, plaintiff's refusal to hire would not have occurred. Plaintiff's failure to get hired would not have occurred in the absence of the above-mentioned retaliatory motives.

354. As a result of retaliatory action by Apple, plaintiff was not only unjustifiably removed from the hiring process, but also denied full time employment opportunities, and potential loss of material benefits such as customary bonus and health benefits.

355. Defendant Apple's actions constitute unlawful retaliation for which the Plaintiff has suffered damages. As such, Plaintiff seeks damages on this Cause of Action including back pay, front pay, compensatory damages, punitive damages, pain and suffering, and attorney's fee in an amount to be determined at trial, but in no event less than $1,000,000.00.

## COUNT EIGHT

### (Against Defendant Apple)

### RETALIATION

*[in violation of New York City Human Rights Law (NYCHRL),*

*N.Y City Admin Code § 8-101 et seq.)]*

356. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

357. New York City Human Rights Law (NYCHRL) protects employees against retaliation by their employer.

358. Defendant Apple's actions were a "motivating factor" in plaintiff's termination. Such actions could deter a reasonable person like the plaintiff from engaging in protected activity.

359. The circumstances defined above were sufficient to prove retaliation based on a protected activity. Defendants' harassment and ill-treatment of Plaintiff violates New York City Human Rights Law (NYCHRL), for which Plaintiff request compensatory and punitive damages.

## COUNT NINE

### (Against Defendant Apple)

### NEGLIGENCE

*[in violation of New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.),*

*New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.)]*

360. Plaintiff repeats and incorporates by reference each and every allegation contained in the

preceding paragraphs as if fully set forth herein.

361. Defendant Apple's hiring team knew about plaintiff's disability / medical condition, yet did not train, supervise or request their own employees or recruiters not to act without standard of care toward the plaintiff. Defendant recruiters discriminated against the plaintiff based on his disability / medical condition, race and gender by delaying and denying plaintiff's application.

362. Defendant facilitated the discrimination and retaliation suffered by the plaintiff by the negligence of its employees or recruiters, including negligent supervision as a result of unsound judgment and/or negligent hiring practices.

363. By not letting the plaintiff proceed though the interviews and the hiring process, the defendant Apple, in violation of their own policies and procedures, released the plaintiff into a "foreseeably uncertain setting" partly of their own making and thereby breached their duty of care.

364. By not timely informing the plaintiff about the outcome of his employment application, the defendant Apple, in violation of their own policies and procedures, released the plaintiff into a "foreseeably uncertain setting" partly of their own making and thereby breached their duty of care.

365. By denying plaintiff career enhancement and development opportunities as a result of fulltime employment at Apple, the defendant Apple, in violation of their own policies and procedures, released the plaintiff into a "foreseeably uncertain setting" partly of their own making and thereby breached their duty of care.

366. Defendant employees were required to act with standard of care toward the plaintiff, however, they breached their duty by first delaying and then denying plaintiff's employment after they learned about plaintiff's employment lawsuit with Deloitte.

367. Defendant Apple knew about plaintiff's disability / medical condition and gender discrimination claims; however, they still did not stop their recruiter from failing to perform

her duties like matching plaintiff's profile with other open roles, scheduling interviews etc.

368. Defendant knew or should have known that plaintiff had made a discrimination complaint against Deloitte in Federal Court, however, did not train, supervise or request their own employees not to act without standard of care toward the plaintiff. Defendant Apple knew about a plaintiff's race and ethnicity; however, they still failed to stop their female Caucasian recruiter from maintaining a gender and race-based bias against the plaintiff.

369. Plaintiff concludes that defendant Apple failed to, in good faith, take measures which were both feasible and reasonable under the circumstances.

## COUNT TEN
### (Against Defendants Apple and Deloitte Consulting LLP)
### FEDERAL & NEW YORK LABOR LAWS
*[in violation of Federal Fair Labor Standards Act (FLSA), New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq., New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq., Labor Law § 215,]*

370. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

371. Plaintiff was not hired by Apple in March 2020, and thus plaintiff faced an adverse employment action.

372. The plaintiff filed his employment complaint in New York Supreme Court against Deloitte in late January 2019, and thus engaged in a protected activity. The complaint was removed to Federal Court of the Southern District of New York in November 2019.

373. In late 2018 and early 2019, the plaintiff used defendant Deloitte's Career transition services and Career portal to apply for full-time positions. On his employment lawsuit, the plaintiff alleged that Deloitte orchestrated recruitment fraud against him. Although, the plaintiff applied to Apple

Jobs directly on the Apple recruitment website, upon knowledge & belief, Deloitte had vested interest in not allowing the plaintiff to secure an alternate employment.

374. Upon knowledge & belief, Deloitte made sure the Plaintiff could not secure alternate employment by coordinating with and conferring with the Human Resource or Recruiting department of defendant Apple. Deloitte has maintained a surveillance on the plaintiff's communications and devices and appear to have tracked plaintiff's phone conversation with Apple, and interjected and disrupted plaintiff's recruitment at Apple. Plaintiff received several spam emails in a known pattern just after his phone call with the Apple Recruiter. Plaintiff also alleges that he ultimately was not hired by Apple, which undisputedly can constitute actionable retaliatory conduct under the statute.

375. In a continued effort to maintain a control on the plaintiff, Plaintiff's alleges that defendant Deloitte sought to damage plaintiff's ability to earn a living by gaining access to not only plaintiff's recruitment efforts at Apple, but also his communications with Federal agencies. Statements not made by the plaintiff on emails or over his recorded Phone interview with the EEOC investigator Ms. Lisa B. from San Jose EEOC Office suddenly appeared on plaintiff's EEOC Charge.

376. Apple Recruiter did not provide any substantive reasons for her refusal to hire the plaintiff. Such improper acts by Apple raise credibility issues because they were in sharp contrast to the past treatment of the plaintiff, where the Apple recruiter selected the plaintiff's profile as a member of the Apple hiring team, and stated she was extremely interested in plaintiff's profile.

377. Defendant Apple knew that plaintiff was a minority employee of Indian origin who would be working for Apple on H-1B visa. Upon knowledge & belief, Apple used applicant's paper credentials to determine who would be selected for interviews. The plaintiff was treated differently than similarly situated White US based applicants. Such White US based applicants who had comparative less 'Paper' qualifications than the plaintiff, were not only selected for interviews but also hired by Apple. Thus, Apple showed racial and national origin bias by hiring White US based applicants who were less qualified than the plaintiff.

378. In addition, the plaintiff was treated differently than similarly situated applicants based on his gender. Upon knowledge and belief, Female applicants were given a preference by Apple, and were hired by Apple. Apple knowingly misjudged and disregarded plaintiff's job qualifications. After Apple rejected the plaintiff, Apple continued to seek Female applicants. White Female applicants who were less qualified than the plaintiff, were ultimately hired. Thus, Apple showed gender-based bias by hiring less qualified Female applicants.

## COUNT ELEVEN

### (Against Defendants Apple and Deloitte Consulting LLP)
### AIDER AND ABETTOR

*[in violation of New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.),*
*New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.)]*

379. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

380. On his employment lawsuit, the Plaintiff has already alleged Defendant Deloitte's misconduct and Deloitte's Partners, Supervisors and Human Resource Resources Professionals aider and abettor conduct.

381. On his employment lawsuit, the Plaintiff has already stated that the defendant Deloitte Human Resource manager Joanna Rohde acted under the color of law to conceal information about the malicious sexual harassment allegation against the plaintiff. Joanna Rohde knew about the protected characteristics of a female pregnant employee. Joanna Rohde conducted an incomplete and inconsistent investigation on the sexual harassment and ethics issues. Plaintiff was knowingly assigned a negative performance rating after such Deloitte employees became aware of plaintiff's disability and sexual harassment allegation. Thus, defendant created a policy or custom under which unconstitutional practices occurred, like giving negative performance rating on his projects in spite of his good performance thereby falsely engineering a non-discriminatory reason for plaintiff's termination

382. Based on the suspicious timings and the sequence of the events, one can easily deduce that,

Deloitte female supervisors and employees coordinated internally, aided and abetted each other, falsely engineered plaintiff's performance rating, thereby schemed to illegally control the Plaintiff, blocked his customary bonus, pay-raise and/or his promotion to the next level. The defendant Deloitte and HR Joanna Rohde were grossly negligent in managing the plaintiff's case and acted with reckless intent against the plaintiff.

383. Defendant Deloitte continued to maintain policy or custom under which unconstitutional practices occurred, for example, supervisors maintained a discriminatory bias against him, and plaintiff was mocked or harassed on each and every project while similarly situated employees were not. These incidents were more than episodic; they were sufficiently concerted and continuous to be deemed pervasive. Plaintiff alleges that the defendant Human Resource manager Joanna Rohde acted under the "color of law" and "actively supported" her colleagues in plaintiff's release from projects, engineered his negative performance evaluation and his eventual discriminatory termination. Plaintiff also states that her decision was tainted by discrimination based on gender stereotypes, and plaintiff was treated differently than similarly situated employees.

384. Plaintiff has further indicated a connection between defendant Apple, defendant Deloitte and other Third Parties like the EEOC. Defendant employees and their alleged discriminatory conduct was specifically targeted towards the plaintiff such that the plaintiff is not allowed or enabled to secure a fulltime job at Apple.

385. Discriminatory practices of senior policy making officials at Deloitte was so persistent or widespread as to constitute a *"custom or usage under law"*, while discriminatory practices of subordinate employees at Deloitte were so manifest as to imply the constructive acquiescence of senior policy makers. Therefore, we can safely deduce and imply the constructive acquiescence of senior "policy-making" defendant officials. Since senior policy making officials were plaintiff's supervisors, for example Brenda Arends was plaintiff's HR supervisor, and either provided an input on or directly influenced plaintiff's termination, their acts or edicts may fairly be said to represent the official policy of defendant, Deloitte Consulting LLP.

386. Similarly, since the defendants Deloitte and Apple acted in concert, the discriminatory

practices of human resource professionals at Deloitte was so persistent or widespread as to constitute a "*custom or usage under law*" and negatively influence Apple's hiring of the plaintiff. Upon knowledge & belief, Deloitte actively schemed against the plaintiff to deprive him of a job opportunity at big multinational firms, and their acts to derail plaintiff's recruitment with Apple cannot go unnoticed.

**COUNT TWELVE**

**(Against Defendants Apple and Deloitte Consulting LLP)**

**DEPRIVATION OF RIGHTS**

*[in violation of Federal Laws, 42 USC § 1983, New York State Laws]*

387. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

388. Plaintiff is a person with disability. Under Americans with Disabilities Act (ADA), the Congress has placed express private rights of action into legislation. See Americans with Disabilities Act, 42 U.S.C. § 12188 (a)(1) ("The remedies and procedures set forth in [the Act] are . . . provid[ed] to any person who is being subjected to discrimination on the basis of disability in violation of [this Act].") (emphasis added)

389. Plaintiff is a person with disability. Section 36.501 of the Americans with Disability Act (ADA) Title III Regulation 28 CFR Part 36 allows private suits. Plaintiff was subjected to discrimination in violation of section 303 of the act or subpart D. The plaintiff was subjected to discrimination on the basis of his disability, in violation of section 42 USC 12183 of this subtitle by the defendants on this lawsuit.

390. Upon information and belief, Defendant Apple and Defendant Deloitte knowingly collaborated with the Equal Employment Opportunity Commission (EEOC), a government agency, to sabotage plaintiff's charge of discrimination. The plaintiff raised such issues with the Director of EEOC, Rosa Salazar, San Jose office.

391. Statements that were not made by the plaintiff on the <u>recorded</u> phone interview with the EEOC

investigator suddenly appeared plaintiff's charge of discrimination which were drafted by the investigator. Defendant and EEOC official abused their official positions, and resources for the purpose of perpetuating the abuse of Plaintiff and depriving him of his civil and constitutional rights, controlling activities of Plaintiff, willfully endangering Plaintiff health, well-being, reputation, and harming his reputation, privacy, quality of life, and personal and economic prospects. Defendant actions violate 42 USC § 1983

392. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial and in a manner and amount that cannot be fully measured or compensated in economic terms and for which there is no adequate remedy at law. The actions of defendant have damaged, and will continue to damage, Plaintiff's economic situation, income, prospects of future income, civil and constitutional rights, and reputation, unless the acts of Defendant complained of herein are enjoined during the pendency of this action and thereafter.

## COUNT THIRTEEN
### (Against Defendants Apple and Deloitte Consulting LLP)
### CONSPRIRACY TO INTERFERE WITH CIVIL RIGHTS
*[in violation of Federal Laws, 42 USC § 1985, New York State Laws]*

393. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

394. Upon information and belief, Defendant has knowingly abused their official positions, and resources for the purpose of perpetuating the abuse of Plaintiff and his civil and constitutional rights, controlling activities of Plaintiff, willfully endangering Plaintiff health, well-being, reputation, and harming his reputation, privacy, quality of life, and personal and economic prospects. Defendant actions violate 42 USC § 1985

395. Plaintiff has identified specific racial animus by defendant Deloitte Consulting LLP. Plaintiff alleges racially abusive actions and comments by defendant Deloitte supervisors and human resource professionals. Based on these statements, one could draw the reasonable inference that Deloitte Consulting harassed the plaintiff in part because of its employees' race - based

hostility towards plaintiff. Deloitte acted in furtherance of their conspiracy to not allow the plaintiff to secure a gainful employment position acted in concert with Apple.

396. Plaintiff has identified specific racial animus on the part of defendant Apple. After learning about plaintiff's gender discrimination, sexual harassment and racial discrimination claims against Deloitte, one could draw the reasonable inference that Apple recruiter maintain a racial bias towards the plaintiff, and/or her actions were "tainted with ... racial animus"

397. The defendants – Deloitte and Apple, and the EEOC investigator, were motivated by plaintiff's racial and gender based invidious discriminatory animus behind their act.

398. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial and in a manner and amount that cannot be fully measured or compensated in economic terms and for which there is no adequate remedy at law. The actions of defendant have damaged, and will continue to damage, Plaintiff's economic situation, income, prospects of future income, civil and constitutional rights, and reputation, unless the acts of Defendant complained of herein are enjoined during the pendency of this action and thereafter.

## COUNT FOURTEEN
### (Against Defendants Apple and Deloitte Consulting LLP)
### TAMPERING AND RETALIATION AGAINST
### WITNESSES, VICTIM, INFORMANT
*[in violation of Federal Laws, Federal Tort Claim Act, New York State Laws]*

399. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

400. Upon information and belief, Defendants have intentionally, knowingly, and tortiously tampered with plaintiff in their attempts to adversely influence Plaintiffs behavior and conduct, to maintain illegal control of Plaintiff. Defendants' actions violate Federal Laws including Common Law or Common Tort Law, or Federal Tort Claim Act, and/or similarly applicable law/s under State Laws, NYCHRL, NYSHRL or NYC Admin Code

401. Upon information and belief, Defendants have intentionally, knowingly, and tortiously retaliated against Plaintiff in their attempts to adversely influence Plaintiffs behavior and conduct, to maintain illegal control of Plaintiff, and to intimidate Plaintiff. Defendants' actions violate Federal Common Law, or Federal Tort Claim Act, or Common Tort Law, and/or similarly applicable law/s under State Laws

402. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial and in a manner and amount that cannot be fully measured or compensated in economic terms and for which there is no adequate remedy at law. The actions of Defendants have damaged, and will continue to damage, Plaintiff's economic situation, income, prospects of future income, civil and constitutional rights, and reputation, unless the acts of Defendants complained of herein are enjoined during the pendency of this action and thereafter.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for Judgement against defendant as follows:

1.   The Plaintiff demands judgment against Defendant Apple in the amount set forth by a jury and for relief requested herein, back pay with prejudgment interest and all the fringe benefits to which he is entitled; pain and suffering, front pay and benefits; actual and punitive damages, and costs incurred because of the Defendant's unlawful behavior; including costs, disbursements, and attorney's fees to the extent permitted by law, and for such and other further relief that this Court deems just, proper and equitable.

2.   That the defendant Apple be required to pay Plaintiff amount set forth by a jury and for relief requested herein, including front pay and benefits; actual and punitive damages, and costs incurred because of the Defendant's unlawful behavior, including all civil penalties authorized by law.

3.   That the defendants Deloitte and Apple be required to pay plaintiff such damages as plaintiff

has sustained, or will sustain, in consequence of defendants abuse of plaintiff's economic, civil and constitutional rights, loss of professional or business income, loss of personal property or profits owned by plaintiff and destroyed by defendants, loss of reputation and willful endangerment, but in no event less than a reasonable compensation for services and damages, accounting all gains and advantages derived by defendants that are attributable to such unlawful acts that relate to the matters described in this complaint, as defined by Federal and State laws, including all civil penalties authorized by law.

4. That the defendants be required to pay plaintiff such all costs related to this action, including interests, and any reasonable future attorney fees (if applicable) with interest if the plaintiff requires so by law, including all civil and criminal penalties authorized by law.

5. That plaintiff be granted such other and further relied upon relief as this court may deem just, proper and equitable

Yours, etc.,

**Ashu Shukla**
*_s_ashu shukla*
*Plaintiff*
202 Salem CT, Apt#11
Princeton, NJ 08540
ashu.shukla@gmail.com
T # 917-488-6143

## **VERIFICATION**

On April 7th, 2021, the Plaintiff affirms that all statements on this Complaint, and are verified to be true under the penalties of perjury, pursuant to CPLR 2016. He had read the complaint, and he believes the matters stated to be alleged in the above sections of the complaint to be true. The source for this information and the ground for his belief were derived from the facts and evidence file maintained in the normal course of business by the plaintiff.

Discovery evidence has also been provided by the defendant Deloitte Consulting LLP as part of their duty to disclose documents on plaintiff's employment lawsuit.

Dated: New York, New York
      April 7th, 2021

Yours, etc.,

      **Ashu Shukla**
      _s_ashu shukla_
      *Plaintiff*
      202 Salem CT, Apt#11
      Princeton, NJ 08540
      ashu.shukla@gmail.com
      T # 917-488-6143

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

RECEIVED
SDNY PRO SE OFFICE

**NOTICE OF RIGHT TO SUE** *(ISSUED ON REQUEST)*

____ 16 PH 1:24

| To: | Ashu Shukla<br>202 Salem Court, #11<br>Princeton Twp, NJ 08540 | From: | San Jose Local Office<br>96 North Third Street<br>Suite 250<br>San Jose, CA 95112 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **556-2020-00798** | **Lisa B. Fung,**<br>**Investigator** | **(408) 889-1957** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally signed by Rosa M. Salazar
DN: cn=Rosa M. Salazar, o=U.S. EEOC,
ou=San Jose Local Office Director,
email=rosa.salazar@eeoc.gov, c=US

January 07, 2021

Enclosures(s)

**Rosa M. Salazar,**
**Director**

*(Date Mailed)*

CC:      Kim Kwang
Senior Counsel Employment Law
Apple, Inc.
One Apple Park Way, MS 169 – 5BE
Cupertino, CA 95014

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 556-2020-00798 |

| CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT & HOUSING | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| **MR. ASHU SHUKLA** | **(917) 488-6143** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **202 SALEM COURT, #11, PRINCETON TWP,NJ 08540** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **APPLE** | **15 - 100** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **ONE APPLE PARK WAY, CUPERTINO, CA 95014** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **11-01-2019**   Latest **03-30-2020**
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

In or around November or December 2019, I applied for various positions within the Product Operations Group. In or around December 2019 to March 30, 2020, I had many telephone interviews/conversations and email correspondence with Apple Recruiter Caitie Wojdak, American Caucasian female, concerning the various positions I applied. Ms. Wojdak said the Apple hiring team reviewed my profile, was interested in my profile, and would be happy to consider my profile for multiple positions. On or about February 4, 2020, I interviewed with Ms. Wojdak and during the interview, I disclosed my disability and told her that I filed a discrimination lawsuit against my previous employer Deloitte due to race, national origin, gender, disability, and retaliation in Federal Court Southern District of New York (S.D.N.Y.). Also, on February 6, 2020, as requested, I again mentioned about my pending wrongful termination lawsuit to Ms. Wojdak via email. Both during and after the interview, Ms. Wojdak told me that she was extremely interested in hiring me for a couple of the positions in the Product Operations Group, and she told me that she would contact me. However, Ms. Wojdak did not contact me. On or about February 19 and March 5, 2020, I sent emails to Ms. Wojdak

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally signed by Ashu Shukla on 01-06-2021 03:05 PM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 556-2020-00798 |

**CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT & HOUSING** and EEOC

*State or local Agency, if any*

requesting for status of the interview and positions, but she did not respond. On March 30, 2020, Ms. Wojdak sent an email stating that I would not be moving forward and there were no genuine reasons given.

Respondent did not provide any reasons for its actions.

I believe that I was discriminated against because of my race - Asian, national origin - Indian, sex - male, disability, and retaliated against because I engaged in protected activities, in violation of my rights as protected by Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act of 1990, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally signed by Ashu Shukla on 01-06-2021 03:05 PM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.